**Maria L. DeCAMP**

v.

**DOLLAR TREE STORES, INC., et al.**

**No. 2004–31–Appeal.**

Supreme Court of Rhode Island.

June 14, 2005.

16

Michael F. Drywa, Esq., for Plaintiff.

Michael A. Gamboli, Esq., for Defendant.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, SUTTELL,
and ROBINSON, JJ.

## OPINION

WILLIAMS, Chief Justice.

The plaintiff, Maria L. DeCamp (plaintiff), appeals from the entry of summary judgment in favor of the defendants, Dollar Tree Stores, Inc. (Dollar Tree), and the plaintiff's supervisor, Kenneth Braz (Braz) (collectively defendants), dismissing the plaintiff's suit, which alleged employment discrimination based upon her sex and her disability. For the reasons set forth below, we reverse the entry of summary judgment on the claim of sex discrimination and affirm the entry of summary judgment on the claim of disability discrimination.

## I

### Facts and Travel

Before plaintiff's employment, Dollar Tree investigated Braz, a district manager, after it received several complaints about his improper treatment of employees in late 1999. Dollar Tree regional human resource manager Karen Dravenstott (Dravenstott) testified in her deposition that she verbally counseled Braz about his treatment of women because Dollar Tree was on notice that Braz treated women differently.[1]

---

1. Dravenstott's typed notes from the investigation delineate complaints from eight Dollar Tree employees, all evidencing Braz's general mistreatment of employees. Of those complaints, three female employees all indicated that Braz treated women differently and especially poorly. Furthermore, a male supervisor who knew Braz from his previous job also stated he treated women differently. The written associate counseling form, signed by both Dravenstott and Braz, did not reflect any counseling pertaining to his treatment of female associates.

Dollar Tree hired plaintiff as a store manager in May 2000. Braz was plaintiff's supervisor for her entire tenure with Dollar Tree. In answers to interrogatories propounded by defendants, plaintiff chronicled multiple incidents of inappropriate treatment by Braz.[2]

In September 2000, Braz warned plaintiff in front of another employee not to dress "like a bum." She believed that he targeted her specifically because she previously had worked for a competitor of Dollar Tree. The plaintiff wore slacks and shoes, rather than jeans and sneakers, to work; she was the only person of forty-five employees dressed so formally.

In October 2000, Braz asked plaintiff what she was doing. When she responded that she was working, Braz said "that remains to be seen." When she asked why he spoke to her in that manner, he replied, "Only to you because you deserve it."

Also in October 2000, plaintiff, after notifying the store opener ahead of time, arrived thirty minutes late to work because she had a doctor's appointment. When she arrived at work, Braz told her to get her "s— together" and that managers were not allowed to be late. After he learned that plaintiff had cleared her late arrival with another employee, Braz demanded to know why she had gone to the doctor. Braz repeated this request until plaintiff admitted that she had gone for a mammogram.

Also in October 2000, plaintiff, who was scheduled to work at 12:30 in the afternoon, arrived at 12:15. Braz accused her of being late. When he learned that she was not scheduled to begin her shift until 12:30, Braz contended that she should come to work a half-hour before her shift.

During the rest of her shift Braz verbally harassed plaintiff and rushed her through her dinner break.

Later in October 2000, plaintiff was having trouble balancing the registers at the end of her shift. Braz repeatedly yelled at her because she was adding the checks too slowly. After plaintiff told Braz to add the checks himself, he replied "If I wanted to do it myself, I would not have hired you." The plaintiff then inadvertently hit the clear button as she added up the checks. Braz responded by pounding his fist on the desk and screaming at her to get out of the store. When Braz locked the door behind her after she left, plaintiff realized she had left her keys in the store. Locked out and waiting to get her keys, plaintiff was joined outside by a coworker who asked whether she was alright. After the two spoke, Braz called plaintiff back into the store. He proceeded to yell at her for telling the coworker his business, told her she was unprofessional, again told her she needed to get her "s— together," suggested that she "rethink" her position with the company, and advised her that she needed to relax. The plaintiff replied that she could not relax with someone yelling at her, and she began to cry. Braz then attempted to console her by telling her she was a good manager with a bright future in the company, and also attempted to joke around and make light of the situation.

When the store's bathroom facilities flooded in November 2000, plaintiff was unable to seek authorization to hire a plumber because she did not have the home office's phone number. The plaintiff could not call another store to get the number because Braz was using the phone,

---

**2.** Braz's version of these events no doubt differs from plaintiff's. Since we are required to view these incidents in the light most favorable to plaintiff, *Ritter v. Mantissa Investment* *Corp.*, 864 A.2d 601, 604 (R.I.2005), plaintiff's answers to defendants' interrogatories are the proper basis for the recitation of the facts in this opinion.

so she proceeded to do other work in the store. Braz then asked plaintiff whether she had called for authorization; she said she had not because he was on the phone. In front of coworkers and customers Braz told plaintiff that "anyone with half a brain could've gotten that done by now" and screamed that he would do it himself.

In December 2000, Braz kicked over a register full of money in the back office in front of plaintiff and another coworker. After the coworker ran from the office crying, Braz ordered plaintiff to clean up the money. While plaintiff picked up the money on the floor, Braz stood over her and laughed.

In late December 2000, plaintiff sought medical treatment. A psychiatrist diagnosed her with a major depression, which in his opinion was "related to a demanding, abusive and deteriorating relationship with her immediate supervisor." He treated her symptoms with individual psychotherapy and a prescription for Paxil. The doctor concluded that plaintiff's symptoms had cleared and that she could return to work for an employer other than Dollar Tree on June 14, 2001.

Soon after beginning treatment, plaintiff called Dravenstott in human resources to complain about Braz's behavior. Dravenstott then conducted "a thorough field investigation" of Braz. The investigation revealed some general negative comments about Braz's treatment of associates; it uncovered no documentation of mistreatment of females specifically. In her depo-

sition, Dravenstott acknowledged that, in the course of her investigation into plaintiff's complaint, she did not ask other employees about Braz's treatment of plaintiff. After this investigation, Braz attended three to four hours of antidiscrimination training.

Dollar Tree initially granted plaintiff six weeks of medical leave. During that leave, plaintiff and Dravenstott discussed plaintiff's future with Dollar Tree. The plaintiff testified in her deposition that she suggested different solutions that would have allowed her to return to work.[3] Dravenstott informed her that her leave expired on February 2, 2001, and that when she returned to Dollar Tree she would be working for Braz. The plaintiff followed her doctor's instructions and did not return to work. Dollar Tree sent plaintiff a letter dated February 6, 2001, informing plaintiff that her failure to return to work was being considered a "voluntary resignation."

The plaintiff first filed a discrimination claim with the Rhode Island Commission for Human Rights. After waiting the requisite period of 120 days pursuant to G.L. 1956 § 28–5–24.1, plaintiff brought an employment discrimination lawsuit against defendants in Superior Court, based on the Rhode Island Fair Employment Practices Act, G.L.1956 chapter 5 of title 28, and the Rhode Island Civil Rights Act, G.L.1956 chapter 112 of title 42.[4] She alleged that Braz's inappropriate treatment constituted

---

3. The plaintiff's deposition testimony on this point is less than clear. She first testified that she requested both additional time for medical leave and a different job so she no longer would have to work for Braz. Then she testified she never asked for a transfer that would enable her to work for someone other than Braz. Finally, she said Dollar Tree also could have fired Braz or, alternatively, organized a sit-down meeting at which Braz could have admitted he had treated plaintiff poorly and

apologized. Many of these suggestions seem to conflict with the recommendation of plaintiff's psychiatrist that she not return to work at all until he had treated her depression successfully.

4. The plaintiff later voluntarily dismissed an additional count of intentional infliction of emotional distress.

sex discrimination, and Dollar Tree's decision to terminate plaintiff while she was on medical leave constituted disability discrimination. After the completion of discovery, defendants brought a motion for summary judgment pursuant to Rule 56(c) of the Superior Court Rules of Civil Procedure. The motion justice granted the motion and dismissed both the sex discrimination and disability discrimination claims.[5] The plaintiff appeals, claiming the motion justice erred with respect to each discrimination claim.

## II

### Analysis

■ This Court reviews the granting of summary judgment *de novo* and applies the same standards as the motion justice. *Ritter v. Mantissa Investment Corp.*, 864 A.2d 601, 604 (R.I.2005). Rule 56(c) provides that a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." We will review this evidence in the light most favorable to the nonmoving party. *Ritter*, 864 A.2d at 604. That nonmoving party then must prove " 'by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.' " *Id.*

### A

### Employment Discrimination in Rhode Island

The State Fair Employment Practices Act (FEPA) prohibits an employer from either discharging an employee or discriminating against an employee with respect to "terms, conditions or privileges of employment" based on that employee's sex or disability. Section 28–5–7(1)(i),(ii). One of the ways the statute defines disability is "any physical or mental impairment which substantially limits one or more major life activities, has a record of an impairment, or is regarded as having an impairment by any * * * employer." Section 28–5–6(4).

The statute further defines "[m]ajor life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Section 28–5–6(4)(ii). FEPA further prohibits an employer from refusing "to reasonably accommodate an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise, or business." Section 28–5–7(1)(iv).

The Civil Rights Act of 1990 (RICRA) similarly provides all persons with "full and equal benefit of all laws" regardless of sex or disability. Section 42–112–1(a). The terms sex and disability "have the same meaning as those terms are defined" in FEPA. Section 42–112–1(d). "A person whose rights under the provision of § 42–112–1 have been violated may commence a civil action for injunctive and other appro-

---

**5.** On the sex discrimination claim, the motion justice found: (1) plaintiff had no evidentiary support for her contention that Braz's treatment of plaintiff was motivated by discriminatory animus related to her gender; and (2) the evidence of Braz's treatment did not support a conclusion that his conduct subjected plaintiff to an abusive work environment. On the disability discrimination claim, the motion justice found: (1) that plaintiff had failed to offer proof that she was disabled within the meaning of the statute; and (2) no reasonable accommodation existed that would have allowed her to work at Dollar Tree.

priate equitable relief, and for the award of compensatory and exemplary damages." Section 42–112–2.

## B

### Gender Discrimination—Two Distinct Theories of Recovery

 Two distinct theories of gender-based employment discrimination arguably apply to this case: gender-based disparate treatment and gender-based hostile work environment.[6] A gender-based disparate treatment claim follows the three-step burden-shifting legal framework first announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Casey v. Town of Portsmouth,* 861 A.2d 1032, 1036–37 (R.I. 2004); *Center for Behavioral Health, Rhode Island, Inc. v. Barros,* 710 A.2d 680, 685 (R.I.1998). A gender-based hostile work environment claim, in contrast, allows an employee to recover against his or her employer "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,'" that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Both theories will be discussed in turn below.

In doing so, this Court will remain faithful to federal precedents interpreting federal antidiscrimination statutes, such as Title VII. *Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights,* 484 A.2d 893, 898 (R.I.1984) (adopting the federal burden-shifting framework in a disparate treatment employment discrimination case pursuant to FEPA).

## 1

### Gender–Based Disparate Treatment

 In a gender-based disparate treatment claim based upon the three-step burden-shifting framework, a plaintiff must establish the following to state a prima facie case:

> "(1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications." *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15 (1st Cir.1994).

The burden of proving a prima facie case "is not especially onerous." *Barros,* 710 A.2d at 685. The second step requires the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action and the third step requires the employee to convince the fact-finder that the legitimate, nondiscriminatory reason was

---

**6.** The motion justice in this case blended the disparate treatment and hostile work environment theories of gender-based discrimination. He first stated that the burden-shifting three-step analysis governed the case and then laid out a six prong "prima facie case of discrimination" identical to the elements of a hostile work environment. This was clear error; a gender-based disparate treatment claim does not depend upon a prima facie showing of a hostile work environment and a hostile work environment claim does not utilize the bur-

den-shifting framework. *Lewis v. Forest Pharmaceuticals, Inc.,* 217 F.Supp.2d 638, 653 (D.Md.2002) (holding the *"McDonnell Douglas* burden-shifting paradigm cannot logically apply to claims of hostile work environment"); *see also* Harold S. Lewis, Jr. & Elizabeth J. Norman, Employment Discrimination Law and Practice, § 3.10, § 2.22(a)(3)-(5) (2001) (separating and summarizing the law on disparate treatment theory and hostile work environment theory).

pretext for unlawful discriminatory animus. *See Casey*, 861 A.2d at 1037–38.

■■■ The plaintiff meets the modest requirements of the prima facie case outlined above. As a female, she is a member of a protected class.[7] She appeared to be in good standing with Dollar Tree before she went on medical leave. Dollar Tree's termination of plaintiff, despite its attempt to characterize it as a "voluntary resignation," undoubtedly qualifies as an adverse employment action. Finally, since there is no indication that her termination was related to corporate downsizing, we can assume that Dollar Tree sought to fill her vacancy with an applicant of roughly equal qualifications. Accordingly, the burden of production now shifts to defendants to articulate a legitimate, nondiscriminatory reason for her termination.

■■■ The motion justice, however, failed to identify defendants' legitimate, nondiscriminatory reason in his ruling, and defendants do not offer any in their brief to this Court. We will not search the record on defendants' behalf and speculate about why defendants terminated plaintiff. Without it, we are left with the presumption that defendants discriminated against plaintiff based on her gender. *Casey*, 861 A.2d at 1037. Accordingly, this case must be remanded for proper application of the burden-shifting framework to her gender-based disparate treatment claim. Once defendants offer their legitimate, nondiscriminatory reason for terminating plaintiff, the parties will be free to argue whether a reasonable juror could conclude that the reason offered is a pretext for discriminatory animus. *Id.* at 1039–40.

We therefore hold the motion justice erred by failing to require defendants to offer a legitimate, nondiscriminatory reason for terminating plaintiff. Thus, summary judgment for defendants on plaintiff's gender-based disparate treatment claim amounts to reversible error.

**2**

**Hostile Work Environment**

■■■ The existence of a gender-based hostile work environment is determined in light of " 'the record as a whole' " and with regard to " 'the totality of circumstances.' " *Meritor Savings Bank, FSB*, 477 U.S. at 69, 106 S.Ct. 2399. The test for determining a gender-based hostile work environment claim is whether: (1) the employee is a member of a protected class; (2) the employee was subjected to unwanted harassment; (3) that harassment was based upon his or her sex;[8] (4) "that the harassment was sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment"; (5) that

---

7. A reasonable juror can find "that every person is in a class protected against gender discrimination." *Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir.2000) (finding that a male employee could be found to be a member of a protected class for purposes of gender discrimination); *see also Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir.2004) (finding that a female employee could be found to be a member of a protected class for purposes of gender discrimination).

8. The hostile work environment theory is often the basis for claims of sexual harassment that affect the "terms, conditions, or privileges of employment" under Title VII, 42 U.S.C. § 2000e-(2)(a)(1). *See Faragher v. City of Boca Raton*, 524 U.S. 775, 782, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The harassing conduct, however, need not be sexual in nature; *"[a]ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive * * *, constitute a hostile environment in violation of Title VII." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir.1999).

harassment "was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so"; and (6) "that some basis for employer liability has been established." *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001).

As is often the case, there is little doubt that plaintiff "is a member of a protected class and that she considered defendants' conduct unwelcome." *Id.* at 728. This is a much closer case in regard to the remaining elements.

▮▮▮▮ Concerning the element requiring the harassment be based on gender, defendants argue credibly that plaintiff cannot prove by competent evidence that Braz's unwelcome harassment had anything to do with her gender. Indeed, none of the incidents involving Braz and plaintiff includes an express reference to her gender, such as referring to her by a derogatory term associated with women.[9] This argument, however, ignores Dravenstott's typed notes and deposition testimony indicating that Braz had been accused of treating women differently and especially poorly. This evidence of Braz's mistreatment of women is the nexus between Braz's treatment of plaintiff and a conclusion that he mistreated her because of her gender. Although this evidence of gender-based treatment may be less than compelling, the evidence that Braz generally treated women especially poorly, when viewed in the light most favorable to plaintiff, creates a genuine issue of material fact about whether Braz's mistreatment of plaintiff was based on her gender for purposes of summary judgment.[10] *Cf. Gliottone v. Ethier*, 870 A.2d 1022, 1028 (R.I. 2005) (holding the less than compelling evidence of photographs of the vehicular damage creates a potential issue of fact barring summary judgment in an automobile negligence case). To hold otherwise would preclude claims in which the harasser, after being counseled not to treat women poorly, has the good sense not to state the true motivations for blatant mistreatment.

▮▮▮ Concerning the creation of an abusive work environment, Title VII, and therefore FEPA and RICRA, are violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' * * * that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21, 114 S.Ct. 367. A review of the totality of circumstances reveals at least seven specific incidents from September

---

9. We expressly reject plaintiff's counsel's contention at oral argument that several incidents of harassment perpetrated against a woman, none of which expressly refers to her gender, somehow can be aggregated to support an inference that the mistreatment had to be harassment based on gender.

10. The defendants contend that the evidence of the prior allegations of Braz's poor treatment of women is inadmissible hearsay. We disagree. Even if the evidence of some of the prior allegations are inadmissible, the hearsay argument is waived for purposes of determining summary judgment because defendants failed to make that argument before the motion justice. *Westinghouse Broadcasting Co.*

*v. Dial Media, Inc.*, 122 R.I. 571, 580 n. 8, 410 A.2d 986, 991 n. 8 (1980). Thus, for the purposes of this *de novo* review, we may consider Dravenstott's typed notes indicating Braz treated women differently.

Finally, we are not persuaded by defendants' attempt to use a gender-based disparate treatment case, in which the employer had provided a legitimate, nondiscriminatory reason for suspending the employee, as authority for, in the context of this hostile work environment claim, the proposition that no reasonable juror could conclude Braz mistreated plaintiff because she was a woman. *See Raytheon Co.*, 220 F.3d at 19–20.

2000 to December 2000 in which Braz was said to have mistreated plaintiff. The most severe incidents occurred when, on one occasion, he slammed his fist on a desk and screamed at her to leave the store, and, on another occasion, he kicked over a register full of money and then proceeded to stand over plaintiff and laugh while she cleaned it up. These incidents were not isolated; he also maintained she did not have half a brain, told her "to get her s—— together," criticized the way she dressed, and repeatedly threatened her job. Although reasonable minds may differ on the ultimate issue at trial, we disagree with the motion justice's finding and hold that this evidence could allow a reasonable juror to conclude that Braz's treatment constituted a frequent pattern of abusive behavior that altered plaintiff's work environment.

■ The next element of a hostile work environment claim requires that the harassment be objectively and subjectively offensive. We make this determination "by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Most reasonable people would consider pounding a desk with one's fist or kicking over a register full of money to be physically threatening and would consider being screamed at in front of coworkers to be humiliating. The plaintiff, as evidenced by her tears and depression, considered the conduct to be hostile and offensive. Viewed in a light most favorable to plaintiff, sufficient evidence exists here to meet this element of a hostile work environment claim.

■ Finally, Dollar Tree's admitted knowledge of Braz's claimed mistreatment of employees generally, and women specifically, clearly qualifies as a basis for employer liability.[11]

We therefore hold that, when viewing the evidence in the light most favorable to plaintiff, she has created a genuine issue of material fact about each element of her hostile work environment claim. Thus, summary judgment in favor of defendants on plaintiff's gender-based hostile work environment claims was reversible error.

## B

### Disability Discrimination

■ The plaintiff also argues that defendants terminated her because of her disability. The now familiar disparate treatment theory can be adapted to assert a claim of disability discrimination. *Equal Employment Opportunity Commission v.*

---

11. On the issue of employer liability, the United States Supreme Court recently has summarized the law on this issue:

"an employer is strictly liable for supervisor harassment that 'culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.' * * * But when no tangible employment action is taken, * * * the employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence: 'The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Pennsylvania State Police v. Suders,* 542 U.S. 129, ——, 124 S.Ct. 2342, 2349, 159 L.Ed.2d 204 (2004) (quoting *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

*Amego, Inc.*, 110 F.3d 135, 141 n. 2 (1st Cir.1997) (analyzing a disability discrimination claim under the Americans with Disabilities Act). Accordingly, the employee first must prove a prima facie case of disability discrimination: (1) he or she was disabled within the meaning of FEPA and RICRA; (2) that the employee was a "qualified" individual, which means that, "with or without reasonable accommodation, she was able to perform the essential functions of her job"; (3) "that the employer discharged her in whole or in part because of her disability." *Id.* Once a prima facie case has been established, the employer then must offer a legitimate, nondiscriminatory reason for discharging that employee and then the employee must convince the fact-finder that the reason offered by the employer is a pretext for discriminatory animus. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 50 & n. 3, 124 S.Ct. 513, 517–18 & n. 3, 157 L.Ed.2d 357 (2003) (applying the *McDonnell Douglas* burden-shifting framework in a disability-based disparate treatment claim). Because we agree with the motion justice that plaintiff has failed to establish a prima facie case of disability discrimination, we need not reach these second and third steps of the burden-shifting framework.

Paralleling the federal Americans with Disabilities Act, proving disability for purposes of FEPA or RICRA is not a simple endeavor. To reiterate briefly, both statutes define disability as "any physical or mental impairment which substantially limits one or more major life activities" and further defines "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning, and working." Section 28–5–6(4), (4)(ii); § 42–112–1(d).[12] Little doubt exists about whether plaintiff's depression, established by the statements of plaintiff's psychiatrist, qualifies as a mental impairment. *Calero–Cerezo v. United States Department of Justice,* 355 F.3d 6, 20 (1st Cir. 2004) (holding depression is a mental impairment).

The more crucial question, separate and apart from whether it is an impairment, is whether plaintiff's depression substantially limited a major life activity. *See Calero–Cerezo,* 355 F.3d at 20–22 (separating the impairment inquiry from whether that impairment substantially limits a major life activity). The plaintiff does not expressly address this issue in her brief; the only life activity referred to is her ability to work. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Thus, when a plaintiff alleges that his or her impairment limits his or her ability to work, "a personality conflict between an employee and a supervisor—even one that triggers the employee's depression—is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor." *Schneiker v. Fortis Insurance Co.,* 200 F.3d 1055, 1062 (7th Cir. 2000).[13]

**12.** The two other definitions of disability are "has a record of an impairment, or is regarded as having an impairment by any * * * employer * * *." Section 28–5–6(4). Because plaintiff does not argue that her depression suffices under the "record of im-

pairment" or "regarded as having an impairment" definitions of disability, we need not address whether plaintiff's depression meets either definition.

**13.** At least two commentators have noted that "[p]laintiffs who plead working as the only

Much of plaintiff's own deposition testimony supports a conclusion that her depression only prevented her from working for Braz. For example, she said under oath that she would have returned to work for someone other than Braz and that she would have returned to work if Dollar Tree fired Braz. She also maintained that she may have been able to return to work for Braz if he acknowledged his mistreatment and apologized. Even considering it in a light most favorable to plaintiff, her own testimony supports a conclusion that her depression did not substantially limit her ability to work a broad range of jobs. Accordingly, we hold that plaintiff has not established an evidentiary basis for her contention that she is disabled for purposes of FEPA and RICRA.

Despite her testimony, plaintiff argues vigorously in her brief that her psychiatrist's statement that she could not return to work until June 14, 2001, creates a genuine issue of material fact on the issue of her disability. If we could analyze this fact without reference to the second element of a prima facie case of disability-based disparate treatment, plaintiff's argument might carry the day. The plaintiff, however, bears the burden of creating a genuine issue of material fact on each element of the prima facie case.

■■ The second element of a disability-based disparate treatment claim requires that the employee be "qualified" in the sense that he or she can perform the essential job functions with or without reasonable accommodation. *Amego, Inc.*, 110 F.3d at 141 n. 2. A fact-finder must be able to conclude that the employee, "while suffering the powerful effects of [his or] her disability, still possessed the ability to function competently and productively in the workplace, either without any modifi-

cation of her work situation or with a reasonable accommodation." *Calero–Cerezo*, 355 F.3d at 22. In the particular context of treatment of work-related depression and anxiety, if an employee's doctor states that the employee cannot return to work for that particular employer, then that fact supports a legal conclusion that the employee no longer is qualified to do the job and no accommodation exists to allow him or her return to work. *Weiler v. Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir.1996).

■ The very evidence that could save plaintiff from summary judgment on the disability element drowns her in regard to the qualified individual element. The letter written by plaintiff's psychiatrist addressed to plaintiff's attorney reads: "By June 14[, 2001], her depressive symptoms had cleared significantly and she was cleared by me to resume work *as long as she did not seek reemployment by the same employer.*" (Emphasis added.) If plaintiff could not return to work for Dollar Tree when she completed her treatment, then no reasonable accommodation existed that would have allowed plaintiff to do her job at Dollar Tree.

■ To summarize, the plaintiff testified at her deposition that she could have returned to work for someone other than Braz, while her psychiatrist stated she never could return to her job at Dollar Tree. But although the psychiatrist's statement, to the extent it disputed the plaintiff's own deposition testimony, could have created a genuine issue of material fact about whether the plaintiff was disabled, that same statement also proves that she was not a qualified individual for her job. We therefore hold that, even when viewing

major life activity that is substantially limited by their impairment have been resoundingly unsuccessful in ADA litigation * * *." Lewis & Norman, § 10.43 at 503.

this evidence in a light most favorable to the plaintiff, she cannot establish a prima facie case of disparate treatment based on disability.[14]

## Conclusion

For the foregoing reasons, we affirm the grant of summary judgment in favor of the defendants on the count of disability discrimination, reverse the grant of summary judgment in favor of the defendants on the count of sex discrimination, and remand the case for further proceedings, pertaining to the plaintiff's allegations of gender-based disparate treatment and gender-based hostile work environment, not inconsistent with this opinion. The record shall be returned to the Superior Court.

14. This opinion should not be read as recognizing disability-based disparate treatment as the sole theory of recovery in a suit alleging employment discrimination based on disability. The elements of a failure to accommodate claim are: (1) the employee "is a qualified individual with a disability within the meaning of the applicable statute"; (2) the employee "works (or worked) for an employer whom [the statutes] cover * * *"; (3) "that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations"; and (4) "the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir.1999). This additional theory is of no help to the plaintiff; her failure to prove that she is a qualified individual with a disability in her disability-based disparate treatment claim also prevents her from surviving a summary judgment on a failure to accommodate claim.