[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is an appeal by the American Legion Post 12 ("Legion") from a decision of the Rhode Island Commission for Human Rights ("Commission"), finding unlawful employment discrimination against three women — Carol A. Cote, Carol A. Stifano ("Pacheco"),[1] and Deborah L. Potter (collectively "complainants") — and awarding both back pay and compensatory damages. The Legion argues that the Commission's decision was arbitrary and capricious and that the assessment of damages was unsubstantiated by the evidence. The Commission and complainants maintain that the decision was supported by the evidence and should be affirmed. Jurisdiction is pursuant to G.L. 1956 §42-35-15.
 FACTS AND TRAVEL
The complainants worked for the Legion in various capacities at its bar in North Kingstown, Rhode Island.[2] Ms. Potter began working for the Legion as a bartender in June of 1983. In 1995, she was promoted to bar manager. Ms. Cote was hired by the Legion in October of 1997 to work full-time as a bartender. Subsequently, her mother, Ms. Pacheco, became employed on a part-time basis as a bartender in February of 1999. All three women were terminated from their positions by the appellant between December 1999 and January 2000.
On April 5, 2000, both Ms. Cote and Ms. Pacheco filed charges with the Commission, against the Legion, alleging employment discrimination in violation of the Rhode Island Fair Employment Practices Act, G.L. 1956 § 28-5-7. More specifically, each complainant alleged that the Legion discriminated against her with respect to terms and conditions of employment and the termination of her employment because of her sex, ancestral origin, and for opposing unlawful employment practices. On May 19, 2000, complainant Potter filed charges with the Commission, alleging that the Legion discriminated against her with respect to terms and conditions of employment in violation of § 28-5-7. In addition, she alleged that she was unlawfully terminated from her employment, in violation of § 28-5-7, in retaliation for assisting in an investigation of discrimination charges against the Legion. A hearing on the matter was held before the Commission on October 8, 2003.
A. Complainants Cote and Pacheco
Complainant Cote testified that shortly after she began working at the Legion, patrons began to call her "Mini Guinea" because of her Italian ancestry.[3] (Hearing Transcript of 10/8/03 (hereinafter "Tr. 1") at 29.) Although Ms. Cote initially took the nickname in jest and invented a cocktail by the same name, she quickly became bothered by it and found it to be offensive. (Tr. 1 at 30.) In addition to asking the patrons to stop referring to her as "Mini Guinea," Ms. Cote complained to Ms. Potter, her supervisor, and Grant Kettelle, Chairman of the Legion's Board of Governors, on numerous occasions about the patrons' use of the offensive nickname. (Tr. 1 at 34, 36.) She testified that despite her complaints, the name calling continued and, on a few occasions, patrons refused to be served by her because she was Italian.[4] (Tr. 1 at 32, 47) Ms. Cote also described how she was called an "[expletive] Guinea" when she refused to serve an intoxicated man at the bar. (Tr. 1 at 47.) She stated that she was so upset by the incident that she started shaking and began to cry. Id.
Ms. Pacheco testified that when she accepted her bartending position with the Legion, although she was aware that her daughter had been subject to name calling, she thought that she "could handle it." (Tr. 1 at 121.) Ms. Pacheco stated that she was called "Mama Guinea" by a patron on her first night of work. (Tr. 1 at 125.) She responded to the patron by telling him: "I will accept the Mama, I will not accept the Guinea." (Tr. 1 at 125-26.) Following that incident, Ms. Pacheco recalled that only one person continued to refer to her in a derogatory fashion by calling her, and her daughter, the "Mama Daughter Guinea Act." (Tr. 1 at 126.) Ms. Pacheco testified that she complained to the manager, Ms. Potter, about the offensive name calling and that she was informed Mr. Kettelle would be notified. (Tr. 1 at 127.)
In addition to the offensive name calling, both women testified that they were subject to incidents of sexual harassment while working at the Legion. Ms. Cote testified that on one occasion a patron, who was sitting at the bar with a member of the Legion's Board of Governors (the "Board"), asked to see a partially visible tattoo that she has on her left breast. (Tr. 1 at 38.) She stated that when she obliged, the man reached over, put his hand down her shirt, grabbed her breast and said "there's nothing there anyway." Id. Ms. Cote testified that she reported the incident to Mr. Kettelle, and he took immediate action by suspending the offender for 30 days. (Tr. 1 at 40.)
Despite the 30 day suspension, Ms. Cote saw the offender back in the building within two weeks. (Tr. 1 at 42). She testified that on a number of occasions, a member of the Board helped to sneak the man in through the back door of the building. (Tr. 1 at 41-42.) She indicated that she notified Mr. Kettelle, but no action was taken. (Tr. 1 at 42.)
Ms. Pacheco testified about a disturbing experience she had with the same man who grabbed her daughter's breast. According to Ms. Pacheco, during the period of time the man was supposed to be suspended from the building, he entered through the front door claiming that he had permission to be there from a member of the Board. (Tr. 1 at 129.) Later on during her shift, after just serving a drink, the man, standing behind the end of the bar with his genitals fully exposed, stated "look over here, what I have for you." (Tr. 1 at 134.) Ms. Pacheco testified that she immediately got so upset that she began to cry. (Tr. 1 at 136.) She then told Ms. Potter about the incident and indicated that she wanted to call the police. (Tr. 1 at 138). Ms. Potter responded, "[Mr. Kettelle] doesn't like any trouble up there with police so they would have to handle it themselves." Id. Upon learning of the incident, Legion management proceeded to ban the offender for life. (Tr. 1 at 138.)
Both women also described incidents when they were licked on the arm by another individual who frequently patronized the bar. Ms. Cote testified that she interpreted the licking as a sexual gesture and, although she told Mr. Kettelle, the man was never disciplined. (Tr. 1 at 51-53.) Ms. Pacheco recounted, "I got his beer and I put it across there and he licked my arm and said he was licking the sweat off my body, off my arm and then he went, `Hum, salty.'" (Tr. 1 at 142.) She testified that she felt belittled and, despite discussing the incident with Ms. Potter, no corrective action was taken. (Tr. 1 at 144, 147.)
Ms. Pacheco also discussed another occasion when, after she got a straw for a customer, he made another lewd remark, which this court will not restate. (Tr. 1 at 146.) She stated that she reported the incident to Ms. Potter, but no disciplinary measures were taken. (Tr. 1 at 147.)[5]
Both women testified that they were surprised by their respective terminations in early December of 1999. According to Ms. Pacheco, she had been told by Mr. Kettelle as recently as that October that her position at the Legion was not in jeopardy. (Tr. 1 at 149.) She stated that she was not aware of any incidents that occurred that could have negatively affected her standing with the Legion between the time of Mr. Kettelle's reassurance and her termination. (Tr. 1 at 150.) Similarly, Ms. Cote testified that she was never disciplined while working at the Legion. (Tr. 1 at 56.) She stated that when she asked Mr. Kettelle why she was fired, he told her that it was because none of the Legionaires would come in and drink anymore. (Tr. 1 at 55.) In addition, Ms. Cote described how, upon having her employment terminated, she became very upset and began to hyperventilate. Id.
During Mr. Kettelle's testimony, he acknowledged that it was undisputed that the women were subject to the incidents of sexual assault and the use of ethnic slurs at the Legion. (Hearing Transcript 10/9/03 (hereinafter "Tr. 2") at 96.) He stated that on a number of occasions he told the men to "knock off" the name calling but that he never brought the issue to the attention of the Board. (Tr. 2 at 97-98.) He also testified that "it's almost impossible" to remove a Legionaire and that "to suspend or expel a Legionaire it's almost an act of God."[6] (Tr. 2 at 101.) Mr. Kettelle explained that although he "never had many complaints on [Ms. Pacheco]," he terminated both women because "business went down that month."[7] (Tr. 2 at 108-09.) Finally, he described how the business suffered as a result of the women because "people would walk out when they came into work or [people] would walk in, and if they were there, [people] would get up and leave." (Tr. 2 at 109.)
In addition to the women's testimony about the harassment they endured, Ms. Cote and Ms. Pacheco testified regarding the amount of money they earned while working for the Legion. Ms. Cote said that she gained a "following" through her positive interaction with the customers and, as a result, was able to earn on average $600.00 a week in tips in addition to her hourly pay at minimum wage. (Tr. 1 at 24, 81.) Ms. Pacheco, who worked significantly fewer hours than her daughter, testified that she made about $150.00 per week in tips in addition the minimum wage she was receiving from the Legion. (Tr. 1 at 123.) Neither woman reported her tips to the Internal Revenue Service because, as they testified, they were told by their employer that they did not have to do so because the Legion was a non-profit business. (Tr. 1 at 73, 164.)
Despite seeking bartending positions following her termination, Ms. Cote remained unemployed for about a year and received unemployment benefits. (Tr. 1 at 57.) Although she ended up bartending one day a week at place named "Giro's," she was eventually worked out of the schedule there. (Tr. 1 at 58.) Ms. Pacheco, on the other hand, was able to find full-time employment, within four months of being fired, as a secretary at a Mazda dealership where she was paid $7.00 an hour. (Tr. 1 at 152.) She also collected unemployment benefits, a total of $87.00 a week, during the period she was unemployed. (Tr. 1 at 152-53.)
B. Complainant Potter
Up until her termination in January of 2000, complainant Debbie Potter had been employed as the Legion's bar manager since 1995. Prior to receiving a promotion, Ms. Potter had worked for the Legion as a bartender beginning in 1983. As bar manager, her duties included opening up the bar, ordering supplies, hiring bartenders, bookkeeping and acting as a liaison between the bartenders and Legion management. (Tr. 1 at 173-75, 213.)
As a result of increased stress at work, Ms. Potter, on two separate occasions, informed Mr. Kettelle that she planned on quitting her job. (Tr. 1 at 179.) Ms. Potter testified that she attempted to quit the first time, in 1998, because of antagonistic comments she was getting at work from patrons regarding how much money the Legion was paying her. (Tr. 1 at 180.) Ms. Potter explained that Mr. Kettelle told her not to worry about it and, ultimately, was able to convince her to stay.Id. She testified that she attempted to quit for a second time, for similar reasons, in August or September of 1999. (Tr. 1 at 181.) Again, Mr. Kettelle encouraged her to stay and told her to "just hang in there" and that he would have to "talk with so and so." Id. Ms. Potter testified further that Mr. Kettelle told her she was "doing a good job." (Tr. 1 at 179.)
On a number of occasions during her employment with the Legion, Ms. Potter had to take time off from work for health related reasons.[8] In 1986, she was out of work for about six weeks due to the birth of her son. (Tr. 1 at 187.) Two years later, in 1988, she underwent back surgery and was out for three to four months. (Tr. 1 at 188.) In 1994, Ms. Potter had a second back surgery and was unable to work for another three to four months. (Tr. 1 at 189.) She had a heart attack in February of 1998 which, although she was able to perform some scheduling and payroll duties from home about a week later, kept her from returning to the Legion for nearly a month. Id. That same year, Ms. Potter had to take a week off because she underwent surgery for skin cancer. (Tr. 1 at 190.) Ms. Potter testified that she was never asked to provide, nor did she provide, any documentation to the Legion, regarding any of the various illnesses mentioned above, in order to be excused from work. (Tr. 1 at 187-90.) In addition, she noted that she was not paid for any of the periods of time for which she was absent. Id.
Two days after both Carol Cote and Carol Pacheco were fired, on December 3, 1999, Ms. Potter learned that she had bursitis in her right shoulder. (Tr. 1 at 191.) As a result, she was advised by her doctor to stay out of work for a couple of months and attend physical therapy. (Tr. 1 at 192.) Ms. Potter wrote a letter to the Legion in which she informed them of her medical condition and apologized for having to leave work during the busy Christmas season. (Tr. 1 at 193.) She also attached a doctor's note to the letter which plainly stated "unable to work." Id.
Subsequently, a couple of weeks after she sent the letter, Ms. Potter had a phone conversation with Mr. Kettelle in which they discussed her absence from work. (Tr. 1 at 195.) She testified that Mr. Kettelle never mentioned anything about when she would be able to return to work or when she was scheduled to work.Id. Ms. Potter stated that, following that conversation, she was contacted by counsel for Ms. Cote and Ms. Pacheco regarding her willingness to give a statement about harassment the two women were allegedly subjected to while employed at the Legion. (Tr. 1 at 197.) Ms. Potter agreed to give a statement because she felt "what happened to them wasn't right." Id. In addition, she retained their counsel for her own representation. Id.
Shortly thereafter, counsel mailed a letter to the Legion's Board of Governors notifying them of Ms. Potter's involvement in Ms. Cote and Ms. Pacheco's respective cases. (Tr. 1 at 2000-1.) Attached to the letter was Ms. Potter's affidavit describing numerous incidents of harassment. (Tr. 1 at 201.) The letter was sent by certified mail and was received by the Legion on December 22, 1999. (Tr. 1 at 202.) Following the Legion's receipt of the letter, Ms. Potter had a second phone conversation with Mr. Kettelle. (Tr. 1 at 207.) Ms. Potter testified that although she had no communication with Mr. Kettelle between their first phone conversation and the second, he indicated that she failed to show up for her scheduled shift the previous Saturday. Id. During their conversation, Mr. Kettelle expressed his displeasure with an article in the local paper concerning the women's allegations against the Legion and then proceeded to inform Ms. Potter that she no longer had a position there. Id.
Mr. Kettelle testified that Ms. Potter was a valuable employee and that he dissuaded her from quitting her job. (Tr. 2 at 120-21.) He denied telling Ms. Potter he needed to know when she was coming back to work, after her letter in December 1999 regarding her absence due to bursitis. (Tr. 2 at 123.) He acknowledged that he never informed Ms. Potter that she had to be at work on the Saturday that she was told she missed her shift and, subsequently, that he cited as the reason for the terminating her employment. (Tr. 2 at 123-24.) Finally, he indicated that although he did not like the affidavit given by Ms. Potter, ultimately, she was fired because she was unable to work as a result of her physical ailment. (Tr. 2 at 104.)
On June 29, 2004, the Commission issued a written Decision and Order regarding the complainants' allegations. The Commission found that both Ms. Cote and Ms. Pacheco were discriminated against because of their sex with respect to their sexual harassment claims. (June 29, 2004 Decision (hereinafter "Decision") at 12.) In addition, it held that the Legion discriminated against the two women because of their ancestral origin and with respect to ancestral origin harassment. Id. at 16. The Commission found for both Ms. Cote and Ms. Pacheco on their charges that their terminations were based on ancestral origin discrimination and were in retaliation for opposing unlawful employment practices. Id. at 19. Furthermore, the Commission found that the women did not prove that the Legion terminated them because of their sex. Id. Finally, with respect to complainant Potter, the Commission determined that her termination was in retaliation for assisting in the Commission investigation. Id. at 24.
The Commission awarded damages, pursuant to G.L. 1956 §28-5-24, to each complainant as a result of the Legion's unlawful employment practices. Ms. Cote was awarded back pay — an average of $600.00 per week in tips plus her hourly minimum wage — from the time of her termination to the time of the decision less the unemployment compensation and the interim earnings she received. (Decision at 27.) Similarly, Ms. Pacheco was awarded back pay — an average of $150.00 per week in tips plus her hourly minimum wage — from the time of her termination to the time of the decision less the unemployment compensation and the interim earnings she received. Id. Although Ms. Potter failed to testify regarding her salary at the Legion, she was also awarded back pay in the "amount she would have earned if she had continued to work for the [Legion]." Id. at 28, 32. In addition, complainants Cote, Pacheco and Potter, were awarded compensatory damages for pain and suffering in the amounts of $25,000.00, $15,000.00 and $5,000.00, respectively. Id. at 32.
On July 21, 2004, the Legion filed an appeal with the Providence County Superior Court. On appeal, the Legion argues that the Commission's decision was arbitrary and capricious, characterized by abuse of discretion and clearly erroneous in view of the reliable, probative, and substantial evidence on the record. Furthermore, the Legion maintains that the Commission committed an error of law by finding that it could be vicariously liable for the actions of its patrons. The Legion also argues that the Commission failed to assign the appropriate weight to the evidence in fashioning its award of damages. In response, the complainants and the Commission assert that the findings of the Commission were supported by the evidence and the damage awards were clearly within its discretion.
 STANDARD OF REVIEW
This Court's review of a decision of the Commission is governed by G.L. 1956 § 42-35-15(g), which provides as follows:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
In reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence. Ctr. forBehavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680,684 (R.I. 1998) (citations omitted). "Substantial evidence has been defined as `such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'"Id. (quoting Newport Shipyard, Inc. v. Rhode Island Commissionfor Human Rights, 673 A.2d 457, 459 (R.I. 1996)). This Court may not substitute its judgment for that of the agency board on issues of fact or with regard to the credibility of witnesses where substantial evidence exists to support the agency's findings. See Mercantum Farm Corp. v. Dutra, 572 A.2d 286,288 (R.I. 1990); Barros, 710 A.2d at 684; Baker v. Dep't ofEmployment and Training Bd. of Review, 637 A.2d 360, 366 (R.I. 1994). As a result, the findings of fact of an agency "are, in the absence of fraud, conclusive upon this court if in the record there is any competent legal evidence from which those findings could properly be made." Mercantum Farm Corp., 572 A.2d at 288
(quoting Leviton Mfg. Co. v. Lillibridge, 120 R.I. 283, 287,387 A.2d 1034, 1036-37 (1978)).
 ANALYSIS
A. Hostile Work Environment Harassment
Under the Rhode Island Fair Employment Practices Act ("FEPA"), an employer is prohibited from discriminating against an employee with respect to the "terms, conditions or privileges of employment" based on that employee's sex or country of ancestral origin. See § 28-5-7(1)(ii). In considering claims brought under § 28-5-7, the Rhode Island Supreme Court has looked to decisions of the federal courts, in construing Title VII of the Civil Rights Act of 1964, for guidance. See DeCamp v. DollarTree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005); see alsoNewport Shipyard, Inc., 484 A.2d at 897-98; NarragansettElectric Co. v. Rhode Island Commission for Human Rights,118 R.I. 457, 374 A.2d 1022 (1977).
In the case at hand, the Commission analyzed the complainants' allegations of sexual and ancestral origin harassment under the so called "hostile work environment" framework. (Decision at 13, 16.) When one undertakes such an inquiry, the existence of harassment is "determined in light of `the record as a whole' and with regard to `the totality of the circumstances.'" DeCamp,875 A.2d at 22 (citing Meritor Savings Bank, FSB v. Vinson,477 U.S. 57, 69 (1986)). In addition, a six-part test is to be applied to determine whether a complainant has a viable hostile work environment harassment claim. Id. at 22-23 (citingO'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)). It must be determined whether
 (1) the employee is a member of a protected class; (2) the employee was subjected to unwanted harassment; (3) that harassment was based upon his or her sex [or ancestral origin]; (4) `that the harassment was sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment'; (5) that harassment `was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so;' and (6) `that some basis for employer liability has been established.'
Id. (citing and quoting O'Rourke, 235 F.3d at 728). Hostile work environment claims based on racial or ancestral origin harassment are subject to the same scrutiny and standards as those based on sexual harassment. See Galdamez v. Potter,415 F.3d 1015, 1023 (9th Cir. 2005); AMTAK v. Morgan, 536 U.S. 101,116 (2003); Abramson v. William Paterson College of New Jersey,260 F.3d 265, 277 (3rd Cir. 2001).
"There is no `mathematically precise test' to determine whether [a party] presented sufficient evidence that he [or she] was subjected to a hostile work environment." Ugurhan AkturkKosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). Rather, the fact finder is to look to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris,510 U.S. at 23. Furthermore, "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."Id.
After a review of the record, this Court does not find that the Commission's decision — finding sexual and ancestral origin harassment against both Ms. Cote and Ms. Pacheco — was arbitrary or clearly erroneous in view of the reliable, probative, and substantial evidence. With respect to the alleged sexual harassment, the record reveals that substantial evidence existed for the Commission to find the Legion liable for hostile work environment sexual harassment under the applicable six-part test. Ms. Cote described how one patron grabbed her breast and another licked her on the arm in a sexual manner. Ms. Pacheco testified that one man licked her arm and then made offensive comments of a sexual nature; another customer made lewd, offensive comments concerning her breasts, and a third patron — while on suspension for grabbing Ms. Cote's breast — entered the bar area and exposed his genitals to her. Both women testified that they were extremely upset by the incidents and that they reported them to either Ms. Potter or Mr. Kettelle. Despite being notified of the patrons' deplorable conduct, the Legion either took no corrective action or, in one case, failed to enforce the suspension it issued which, subsequently, led to a repeat offense by the suspended individual. The Legion did not dispute, and the record supports, the occurrence of these episodes.
With respect to the Commission's determination that the women were victims of ancestral origin harassment, the record again reveals sufficient evidence to support the finding. Shortly after she started working for the Legion complainant Cote was given an ethnic derogatory nickname. Upon notifying Mr. Kettelle that she was upset by the name calling, he told the offenders to "knock it off." Despite his efforts, the name calling persisted and elevated to include a deplorable obscenity, and patrons were refused to be served by her. Similarly, when her mother, Ms. Pacheco, started working at the Legion, she was referenced by a similar derogatory name. Although she notified Ms. Potter that she was offended by the nickname, she later heard the references continue. Mr. Kettelle took no further action.
The above-mentioned facts were sufficient for a finding of hostile work environment harassment, of both the allegations of sexual and ancestral origin harassment, under the applicable six-prong test. Both complainant Cote and Pacheco are clearly members of protected classes as they are female and born of Italian descent. Both women testified that they were subject to unwelcome sexual harassment of a physical and verbal nature and unwelcome ancestral origin harassment of a verbal nature. SeeChamberlin v. 101 Realty, Inc., 915 F.2d 777, 784 (1st Cir. 1990) (the "unwelcomeness" of sexual advances necessitates a finding of uninvited and offensive conduct from the standpoint of the employee). The women did not solicit the conduct; they complained about it and, on some occasions, were driven to tears as a result of it.
Furthermore, the alleged harassment was unquestionably based on sex and ancestral origin. See Gorski v. New Hampshire Dep't ofCorr., 290 F.3d 466, 471-72 (1st Cir. 2002) ("[D]iscrimination `because of . . . sex' includes `requiring people to work in a discriminatorily hostile or abusive environment.' . . . Sometimes, a workplace becomes a hostile working environment for a female employee because of other employees' sexual innuendos or unwelcome sexual advances[.]" (citing Harris, 510 U.S. at 19,21)). The evidence in the record indicates that the harassment was of a sexual nature. In addition, the terms used were disparaging for persons of Italian descent and were used as ethnic slurs.
The evidence supported the finding that the harassment was sufficiently severe and pervasive so as to alter the conditions of plaintiffs' employment and create an abusive work environment. The Commission was charged with determining whether the complainants were subject to a hostile work environment by viewing the record as a whole and looking to the "totality of the circumstances." See DeCamp, 875 A.2d at 22 (citing MeritorSavings Bank, 477 U.S. at 69). The continual use of the ethnic slurs, the refusal of patrons to be served by women of Italian descent, and the repeated instances of inappropriate and unwelcome conduct of a sexual nature, provide the requisite evidence for reasonable minds to find the complainants were subject to an abusive work environment. Accordingly, the Commission's finding of a hostile work environment, which does not require determination by a "mathematically precise test," cannot be considered here as clearly erroneous. See UgurhanAkturk Kosereis, 331 F.3d at 216 (citing Harris,510 U.S. at 22).
With regard to the fifth prong of the test, the testimony elicited at the hearing was such that the Commission could find that the harassment was both objectively and subjectively offensive, that a reasonable person would find it hostile or abusive, and that the victim in fact did perceive it to be so. Both women testified that they found the name calling and the unwelcome sexual conduct offensive and belittling. In addition, the evidence shows that the women perceived such name calling and behavior to be hostile at the time they were subject to the conduct. Ms. Pacheco and Ms. Cote were left shaking and crying following the incidents. In addition, the women complained about the behavior to their supervisors on numerous occasions after the occurrences. Furthermore, a reasonable person would find ethnic slurs, sexual comments, exposure, and physical contact (licking of the arm and grabbing) to be objectionable in the ordinary workplace.
The sixth prong of the hostile work environment test focuses on the Commission's decision to hold the employer liable for the harassing conduct of its patrons and, in this case, members of the employer's organization. Despite the Legion's contention that such a finding has no legal basis, the case law suggests otherwise. "An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it." Galdamez, 415 F.3d at 1022 (citations omitted). A number of courts have reached similar conclusions.See Folkerson v. Circus Circus Enterprises, Inc.,107 F.3d 754, 756 (9th Cir. 1997); Lockard v. Pizza Hut, Inc.,162 F.3d 1062, 1074 (10th Cir. 1998) (employers may be held liable for customer harassment "if they `fail to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known'") (quoting Hirschfeld v. New Mexico Corrections Dep't,916 F.2d 572, 577 (10th Cir. 1990)); see also Little v.Windermere Relocation, Inc., 301 F.3d 958, 968 (9th Cir. 2001);Van Horn v. Specialized Adult Services, 241 F. Supp. 2d 994,1012 (S.D. Iowa 2003).
In the case at hand, the record indicates that complainants Cote and Pacheco repeatedly made the Legion aware of the patrons' harassing conduct. Despite its knowledge, the only action taken by the Legion to prevent the derogatory remarks and actions, with respect to the women's Italian heritage, was to tell the patrons to "knock it off." Although it was clearly communicated to the women's supervisors — through their repeated complaints — that the conduct had not ceased, the Legion took no further disciplinary measures.
Similarly, the Legion did not take sufficient corrective action to prevent future instances of sexual misconduct when it was alerted to the individual instances of sexual harassment. The Legion did suspend one individual — who was not a Legionaire — but the punishment was severely undermined when he would repeatedly "sneak in" to the building, with the help of a member of the Board, with no further repercussions. It was not until he committed a second offense, by exposing his genitals, that he was permanently banned.
Considering that many, if not all, of the patrons engaged in the harassment were Legion members, there is an even greater nexus between the employer and the actionable "third-party harassment" in this case. Mr. Kettelle admitted that "it's almost an act of God" to suspend or expel a Legionaire and the Legion's inaction was consistent with that philosophy. Although small attempts to curb the problems were made, the Legion never made it clear to the patrons that it would simply not tolerate the harassing behavior. Accordingly, the Commission had substantial evidence before it to find that the Legion failed to remedy or prevent the hostile work environment although it was aware of its existence.
B. Disparate Treatment Discrimination
The Legion argues that the Commission's finding, that Ms. Cote and Ms. Pacheco were victims of unlawful discrimination with respect to their ancestral origin, was clearly erroneous in view of the reliable, probative, and substantial evidence on the record. After reviewing the record, this Court finds that the Commission's decision was not clearly erroneous.
Discrimination allegations relating to the termination of employment are reviewed under the disparate treatment "burden-shifting framework" initially set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green,411 U.S. 792, 802-04 (1973). See DeCamp, 875 A.2d at 21
(citations omitted). Under this analysis, the plaintiff must first set forth sufficient facts to make a prima facie case of discrimination. DeCamp, 875 A.2d at 21. In order to do so, a plaintiff must establish the following:
 "(1) he or she belongs to a protected class, (2) he or she was qualified for the position, (3) despite the requisite qualifications, he or she was discharged from the position, and (4) the position remained open and was ultimately filled by someone with roughly equivalent qualifications to perform substantially the same work." Barros, 710 A.2d at 685 (citations omitted).
The burden of presenting the prima facie case "is not especially onerous." Id.
Once the plaintiff has set forth sufficient facts to make out a prima facie case, the next step requires that the employer "offer a legitimate, nondiscriminatory reason for the adverse employment action." Id. After that is accomplished, the employee must ultimately "convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." Id. at 21-22 (citing Casey v. Town of Portsmouth,861 A.2d 1032, 1037-38 (R.I. 2004)). It is the plaintiff who has the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him or her]." St.Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (citingTexas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253
(1981)).
In light of the burden-shifting framework described above, this Court finds that there is substantial evidence on the record to support the Commission's decision that the women were discriminated against on the basis of their Italian heritage. The record reflects that Ms. Cote and Ms. Pacheco submitted evidence to meet the burden of presenting their prima facie cases: (1) they both testified that they are of Italian descent, (2) there was no evidence that either woman had received any warnings about inadequate job performance, in fact, they both testified that they had received positive feedback from management, (3) they were terminated, and (4) the position was ultimately filled by another bartender not of Italian descent.
Although the Legion alleged a legitimate non-discriminatory reason for the terminations, that "business was down that month," the Commission, as fact-finder, found that this reason was a pretext for unlawful discrimination. In its decision, the Commission stated:
 "The respondent did not specify how much business went down nor did it submit any records on the purported loss. Mr. Kettelle's explanation of the loss in business was as follows: `It's already been on the floor here three or four times that people would walk out when they came into work, or they would walk in, and if they were there, that they would just get up and leave. We have legionnaires that just — [His testimony was stopped by a question from counsel.]' [Tr. 2 at 109.] The previous testimony about people avoiding service from complainant Cote and complainant Pacheco was that several members would leave to avoid being served by them or refuse to be served by them because they were Italians. [Tr. 1 at 32, 36, 47, 182; Tr. 2 at 8, 11.] The refusal of a number of members to be served by people of Italian ancestry is a discriminatory reason for termination. An employer cannot use its customers' discriminatory preferences as a justification for its employment decisions. See Diaz v. Pan American Airways, Inc., 442 F.2d 385
(5th Cir. 1971), cert. denied 404 U.S. 950, 92 S. Ct. 275, 30 L.Ed.2d 267 (1971) (customer preference for female flight attendants was not a valid defense to the employer's discriminatory refusal to hire males)[.]" (Decision at 22.)
Ultimately, after considering the evidence in its entirety, the Commission determined that "it was clear that ancestral origin discrimination" was a factor in the decision to terminate complainants Cote and Pacheco. (Decision at 23.)
As previously stated, this Court may not substitute its judgment for that of the agency on issues of fact, or with regard to credibility determinations, where substantial evidence exists to support the agency's findings. Furthermore, in the absence of fraud, the Commission's findings of fact are conclusive upon this court if in the record there is any competent legal evidence from which those findings could properly be made. Here, the evidence in the record, as cited by the Commission's decision, was such that a reasonable mind could conclude that Ms. Cote and Ms. Pacheco were terminated because of their ancestral origin rather than because "business went down." Therefore, the Commission's decision was not clearly erroneous.
C. Retaliatory Discharge
In addition to finding that Ms. Cote and Ms. Pacheco were discriminated against because of their ancestral origin, the Commission concluded that all three complainants — Ms. Potter, Ms. Cote and Ms. Pacheco — were unlawfully terminated by the Legion in retaliation for opposing its discriminatory employment practices. Again, the Legion argues that this finding was arbitrary and clearly erroneous in light of the reliable, probative, and substantial evidence on the record.
A claim for unlawful retaliatory discharge follows the same burden-shifting framework as discussed above although the elements of the prima facie case are different. To make out a prima facie case for retaliatory discharge, one must establish that "(1) [he or] she engaged in protected conduct; (2) [he or] she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Calero-Cerezo v. United States Dep't ofJustice, 355 F.3d 6, 25 (1st Cir. 2004) (citing GU v. BostonPolice Dep't, 312 F.3d 6, 14 (1st Cir. 2002)).
With respect to Ms. Cote and Ms. Pacheco, they met their burden of presenting a prima facie case for retaliatory discharge by establishing that they complained about the ancestral origin and sexual harassment of the patrons, they were fired, and they were terminated shortly after complaining about individuals who refused to be served by them because they were Italian. Furthermore, despite the Legion's insistence that these women were fired because of poor business, this Court finds that there was substantial evidence on the record to support the Commission's conclusion that they were terminated in retaliation for their complaints. The Commission found:
 [t]he termination came soon after complainant Cote lodged a complaint about [a member's] use of an ethnic epithet towards her. [The member's] refusal to enter the club as long as she was employed was a response to Mr. Kettelle's attempt to deal with [the member's] ethnic slurs. As complainants Cote and Pacheco refused to accept sexual harassment or ethnic harassment, their relationship with the discriminating members soured . . . [R]espondent ultimately terminated complainant Cote and Pacheco because there were members who would not be served by them. (Decision at 23.)
Although no one specifically testified that Ms. Cote and Ms. Pacheco were fired as a result of their complaining about the patrons' use of ethnic slurs, there was reliable, probative and substantial evidence that the purported reason for termination was a pretext. Both women testified that they repeatedly complained about being harassed. The record reveals that some patrons became more hostile — they refused to be served and some declined to enter the bar when Ms. Cote and/or Ms. Pacheco were working — after they became aware that the women had complained to their supervisors about being called "Guineas." Also, as was noted in the Commission's decision, their terminations were close in time to a complaint made by Ms. Cote about a member refusing service from her because she was Italian. Given the deference afforded to the Commission in these matters, this Court finds that the Commission's decision, finding that Ms. Cote and Ms. Pacheco were terminated in retaliation for opposing unlawful employment practices, was not clearly erroneous.
With respect to Ms. Potter's termination, this Court finds that there is reliable, probative and substantial evidence in the record so that a reasonable mind might conclude that she was terminated in retaliation for opposing unlawful employment practices. Ms. Potter was clearly engaged in protected conduct when she decided to cooperate with Ms. Cote and Ms. Pacheco's counsel and the Commission, regarding their allegations of harassment against the Legion. See § 28-5-7(5) (it is unlawful for any employer to discriminate in any manner against any individual who assists in an investigation proceeding under the Fair Employment Practices Act). Furthermore, the record demonstrates evidence of a causal connection between Ms. Potter's assistance in the investigation of the harassment allegations and her termination. The Commission reasoned that "the shortness of time between the protected activity and the adverse action" was sufficient to establish the required causality.[9] SeeSmith v. Maschner, 899 F.2d 940, 949 (10th Cir. 1990) (timing can be circumstantial evidence of an improper motive); seealso Adams v. Green Mt. R.R. Co., 862 A.2d 233 (V.T. 2004).
Additionally, there was substantial evidence on the record that the Legion's legitimate nondiscriminatory reason for Ms. Potter's termination — that she was fired for not coming to work — was pretextual. Prior to being discharged, Ms. Potter had been absent from work numerous times due to illnesses and physical limitations and was always welcome back to work. When she initially informed Mr. Kettelle that she had to take time off because of her bursitis, he stated no objection and did not tell her that she had to be back by any specific date. It was not until after the Legion learned of Ms. Potter's cooperation in the harassment investigation that it voiced concern about her missing time at work. Moreover, although the record indicates that Mr. Kettelle told Ms. Potter she was fired because she failed to show up to work on a particular Saturday, he testified that he had never actually informed her that she was expected to work on that date. Finally, there was evidence that Mr. Kettelle encouraged Ms. Potter to remain in her position as bar manager at the Legion, on multiple occasions, when she expressed her intentions to quit — the last occasion only being a few months prior to her discharge.
Ultimately, the Commission had reliable, probative, and substantial evidence before it that Ms. Potter was terminated in retaliation for cooperating with the investigation of Ms. Cote and Ms. Pacheco's harassment allegations. Accordingly, the decision was not arbitrary or clearly erroneous.
D. Compensatory Damages
The Legion argues that the Commission's compensatory damage awards were inappropriate because the Commission failed to assign the appropriate weight to the evidence and was influenced by passion and prejudice in generating the damage amounts. Section 28-52-4(b) of FEPA provides for awards of compensatory damages when the Commission finds "intentional discrimination in violation of this chapter." The statute defines "intentional discrimination" as "any unlawful employment practice except one that is solely based on a demonstration of disparate impact."Id. The compensatory damages provision also states, "[t]he complainant shall not be required to prove that he or she has suffered physical harm or physical manifestation of injury in order to be awarded compensatory damages." Id. The compensatory damages that the Commission can award for discrimination claims are not merely "incidental to other relief sought;" rather, they constitute a substantial portion of the basic relief that the commission may award. FUD'S, Inc. v. State of Rhode Island,727 A.2d 692, 697 (R.I. 1999). In reviewing compensatory damage determinations, the Court will not override the Commission's award unless it is "unsupported by the evidence, grossly excessive, or shocking to the conscience." McKinnon v. Kwong WahRestaurant, 83 F.3d 498, 506 (1st Cir. 1996).
Although pain and suffering is not required for the Commission to fashion compensatory damage awards, it based the awards in the case at hand on its findings that both Ms. Cote and Ms. Pacheco were emotionally distressed by the discrimination and harassment they were subject to at the Legion. The evidence in the record supports these findings as Ms. Cote and Ms. Pacheco were clearly distraught about the way they were treated and reduced to tears on multiple occasions. In addition, Ms. Pacheco described how she hyperventilated upon learning she was terminated. Considering the evidence before the Commission and other compensatory damage awards upheld by courts in the employment discrimination context, this Court does not find the Commission's compensatory damage awards of $25,000.00, $15,000.00 and $5,000.00, to be either excessive or an abuse of discretion.[10]
E. Back Pay Award
The Legion also maintains that it was inappropriate to base the back pay awards on the testimony of the bartenders when they were unable to present any other evidence regarding the amount of money they earned and considering they admittedly failed to report their earnings to the Internal Revenue Service ("IRS"). Although the women's testimony is the only evidence in the record of their total earnings, such evidence is sufficient to use as a foundation for calculating an award of back pay.
The Third Circuit Court of Appeals, in Atlantic Limousine,Inc. v. National Labor Relations Board, 243 F.3d 711 (3rd Cir. 2001), found that the vicitms' claims for back pay were proven through their own testimony regarding the amount of tips received. Id. at 718, 721. Although the employer argued that the employees should not receive back pay for tips claimed that conflicted with the employees' tax returns, as they were unreported to the IRS, the Court found, "the fact that [the employees'] sworn testimony that they underreported their income exposed them to tax evasion and perjury charges actually bolsters their credibility." Id. at 719. Furthermore, the Court held that the employer failed to meet its burden "as the wrongdoer, to establish facts to dispute the claim of the aggrieved employee."Id. at 720 (citing NLRB v. Brown Root, Inc., 311 F.2d 447, 454 (8th Cir. 1963)). Ultimately, the employees' testimony was considered substantial evidence sufficient to support the finding that the unreported tips should be included in the back pay award. Id. at 721.
In the instant matter, the Legion did not present any evidence that conflicted with Ms. Cote's and Ms. Pacheco's versions of how much money they received in tips.[11] The Legion simply argued that the women could not receive back pay for money they did not report to the IRS. As the Court stated in AtlanticLimousine, such testimony can actually be found to bolster a witness's credibility. Ms. Cote and Ms. Pacheco testified that they received approximately $600.00 and $150.00 per week in tips, respectively. Accordingly, there was substantial evidence before the Commission to support its finding with respect to the amount of money the women earned while working at the Legion. SeePsychiatric Inst. of Washington, 871 A.2d at 1153 (the Court will reverse an agency award only if the agency's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law) (citing Joel Truitt Mgmt.,
646 A.2d at 1010). As was previously stated, this Court may not substitute its judgment for that of the Commission on the findings of fact. Therefore, this Court finds the Commission's award did not constitute an abuse of discretion.
 CONCLUSION
These were not games by adolescents. These were reprehensible acts, by grown men who should have known much better. The repugnant actions of staff and customers, continuous and unchecked by the employer or its governing officials, gives this court great pause. The failure of those in control to prevent the ongoing harm illustrates that their conduct was not mere callous indifference. Not only did the respondents fail to rise to the occasion by ensuring common decency in their establishment, they condoned the behavior by sticking their heads in the sand. Under the statutory schemes, and common sense, the commission was justified in concluding that respondents sanctioned this obvious vulgarity. The board was well within its authority in doing so.
After review of the entire record, this Court affirms the decision of the Commission. It was supported by the reliable, probative and substantial evidence in the record, and was not clearly erroneous or arbitrary, and did not constitute an abuse of discretion. Substantial rights of the respondents have not been prejudiced.
[1] Following the filing of the underlying action, Ms. Stifano was married and has since changed her last name to "Pacheco."
[2] The American Legion is a national organization for war-time veterans. In addition to coordinating many community service activities, the American Legion provides opportunities for social activity and mutual support among its members. The organization is comprised of local "Posts," located throughout the country, where members meet and organize on a community level. In order to accommodate American Legion events and to provide a place for members to socialize, many Posts, including the appellant, contain a bar area.
[3] The American Heritage Dictionary 780 (4th ed. 2000), defines the term "guinea" as "[o] ffensive [s] lang
[u]sed as a disparaging term for a person of Italian birth or descent."
[4] This testimony was corroborated by another witness, Gerald Giguere, who stated that two men "refused to be served by Italians and they were adamant about it. It wasn't nothing that they were joking around; it was serious." (Tr. 2 at 11.)
[5] Ms. Pacheco later testified that she did not use the incident book because she verbally notified management of the "incidents" that occurred while she was working.
[6] The man who was suspended for life from the Legion was not a "Legionaire." Rather, he was an associate member of the organization and, therefore, was not afforded many of the privileges and benefits of Legionaire status. (Tr. 2 at 101-02.)
[7] Although the appellant states that Ms. Cote "admits to cashing insufficient funds checks made payable to the [Legion] with no evidence of making restitution" to infer that it was a factor in her dismissal, it was her undisputed testimony that she eventually paid the Legion the amount owed on the checks. (Appellant's Memorandum at 2; Tr. 1 at 75-77.)
[8] In addition, Ms. Potter did not work at the Legion for a period of one year and a half, between 1989 and 1991, because she moved to Pennsylvania with her husband. Upon her return, she was rehired as a bartender.
[9] In its decision, the Commission stated, "[t]he Board of Governors received complainant Potter's affidavit between December 22, 1999 and complainant Potter's termination on January 11, 2000. Given the intervening holidays and the need to call a Board of Governor's meeting to terminate complainant Potter, it is patent that the interval between the knowledge of the Board of Governors of complainant Potter's assistance in the Commission investigation and her termination was extremely short." (Decision at 25.)
[10] See White v. New Hampshire Dep't of Corr.,221 F.3d 254 (1st Cir. 2000) (the court affirmed a jury award of $45,000.00 to a female department of corrections officer who was found to have been the victim of direct sexual harassment, hostile work environment harassment, and retaliatory discharge);Williams v. Trader Publishing Co., 218 F.3d 481, 484, 486 (5th Cir. 2000) (the court upheld a jury award of $100,000.00 in compensatory damages where plaintiff was found to have been the victim of sex discrimination that resulted in her losing sleep, suffering significant weight loss and caused her to develop a smoking habit); Kimbrough v. Loma Linda Dev., Inc.,183 F.3d 782 (8th Cir. 1999) (compensatory damage awards of $50,000.00 and $10,000.00 were upheld by the court where the plaintiff waitresses were humiliated in front of patrons as a result of verbally harassing comments of a sexual nature). SeePsychiatric Inst. of Washington v. D.C. Comm'n on Human Rights,871 A.2d 1146, 1153 (D.C. 2005) ("a compensatory damages award must be upheld unless it is `well beyond the reasonable range'") (citing Joel Truitt Mgmt. v. D.C. Comm'n on Human Rights,646 A.2d 1007, 1010 (D.C. 1994) (quoting Louison v. Crockett,546 A.2d 400, 404 (D.C. 1988))).
[11] Surely, some tips were earned, other employees received tips and some tip income was reported. Yet no evidence on the tip income was proffered, but for that of the victims. Indeed, the Legion did not seriously dispute the amount of damages prior to the Decision below.