DECISION
In this administrative appeal, Appellant J.J. Gregory Son Inc. seeks reversal of a decision of the Rhode Island Commission for Human Rights that found that the company had discriminated against Brenda A. Zeigler on the basis of her gender. For the reasons set forth in this Decision, this Court rejects that appeal and affirms the Decision of the Commission.
 I Factual Background
On February 18, 2004, Zeigler filed a charge of discrimination with the Commission claiming to have been "subjected to discriminatory terms and conditions of employment by my former employer. . . ." (Resp. Ex. A.) Further, Zeigler asserted that John J. Gregory, Jr., President of J.J. Gregory Son Inc. ("J.J. Gregory"), "took no action to correct the discriminatory and hostile environment in which [Zeigler] was forced to work." (Id.) Additionally, she claimed that she had been "discriminated against on the basis of [her] sex (female) in that [her] employer allowed [her] manager to subject [her] to disparate treatment based solely on [her] sex." (Id.) Zeigler also asserted that she was terminated in retaliation for opposing unlawful employment practices. (Id.) *Page 2 
On November 8, 2005, the Commission mailed a Complaint and Notice of Hearing to the parties. The Preliminary Investigating Commissioner determined that probable cause existed to believe that J.J. Gregory had violated R.I. Gen. Laws 1956 § 28-5-7. The Complaint alleged that Zeigler's supervisor, Mark Darling, treated her differently than similarly situated male employees and that Zeigler was terminated in retaliation for opposing the disparate treatment. The Commission held hearings on May 30, 2006, June 16, 2006, July 17, 2006, and August 17, 2006 regarding this matter. The following is a summary of the material aspects of the witnesses' testimony at those hearings and the Commission's findings.
 A Brenda Zeigler's Testimony
At the first hearing, Zeigler testified that she worked in the parts department of equipment stores for the past twenty-five years. (Tr. at 5, May 30, 2006.) According to her testimony, she had "built up a reputation. I have customers that actually follow me, you know, to [different] businesses just because of . . . how I serve them, and my customers always has [sic] been my number one priority. Without my customer [sic], I wouldn't have a job so I kind of take pride in what I do." (Id. at 9.) At J.J. Gregory, she was a "parts counterperson." (Id. at 8.) She answered telephone calls and waited on in-store customers. (Id.) Zeigler left her previous job because J.J. Gregory was "going to start me with thirteen dollars an hour, plus medical which I didn't have." (Id.)
Zeigler recalled that she began working at J.J. Gregory in 2001. (Id. at 6.) Regarding the hiring process, Zeigler testified that she had a meeting with Mark Darling one Saturday morning. That morning, she also spoke to Rick Brogan and J. Gregory *Page 3 
("Gregory") in Brogan's office. (Id. at 8, 54.) Zeigler testified that Darling was the parts manager, Brogan was the store manager, and Gregory was one of the owners. (Id. at 8-9.) When she began working in the parts department, she joined Bob Stevenson, Fred Weigand, and Darling. (Id. at 10.) About a year after Zeigler began working there, Stevenson retired and was replaced by Rob Botham. (Id. at 14.) Doris Sears was the secretary for the parts department. (Id. at 13.)
Ms. Zeigler testified that she did not encounter any problems working for J.J. Gregory until approximately six months after she started there. (Id. at 16.) She explained:
 I just wasn't treated equally. I was spoken to very harshly. I was always singled out from the gentlemen. You know, any time there was a problem, I was the first one to be confronted. No matter what I did wasn't right. The way I was spoken to was without respect. Just the way I was treated there overall by Mark Darling basically.
(Id.) She testified that Darling made her job difficult. (Id. at 18.) When she confronted Darling about this treatment, he said that he did not have a problem with her. (Id.) One month or two before Zeigler left J.J. Gregory, after nearly two and one-half years of employment there, she wore sneakers to work. Zeigler testified that Darling confronted her and spoke with her harshly. She described their exchange as follows:
 [He said,] "What are you doing with sneakers on?" I said, "My feet hurt." He said, "You're not supposed to wear sneakers." I said, "I wasn't aware of that." I said, "My feet hurt today and the sneakers made them feel better." He said, "Well, you're not supposed to wear sneakers. You go get corrective shoes if you have to." And I was just stunned because there was a gentleman working at the counter that was there for 36 years that actually had sneakers on his feet that day. The other gentleman there, Rob Botham. Every day he worked there, he had sneakers on and they were white. Mark Darling has worn sneakers *Page 4 
there. Everyone wore sneakers there. The one day I did, I was confronted.
(Id. at 16-17.) When Zeigler informed Darling that others were wearing sneakers, he told her that "he wasn't aware that anyone else had sneakers on." (Id. at 60.) Zeigler testified that Darling had a meeting about employees wearing sneakers the following day. (Id. at 60-61.)
Zeigler testified about other treatment that she considered unfair. On one occasion, Darling waited until the end of the work day to give Zeigler a $100 bonus that he had dispensed to Weigand and Botham in the morning. (Id. at 19-20.) Zeigler also described disagreements she had with Darling regarding her lunch hour. When Zeigler would delay her lunch hour to assist a customer, Darling reminded her that her lunch hour started at noon. (Id. at 22.) Though Weigand and Botham had the same practice of delaying lunch to assist the clientele, Zeigler never saw Darling confront them about it. (Id at 22-23.)
On another occasion, Zeigler asked Darling for a pair of gloves that would protect her hands from hydraulic oil and grease on the hydraulic hoses that she repaired because the cloth gloves that she had been using did not protect her hands. (Id. at 23-25.) Zeigler testified that Darling directed her to the Service Department, but the rubber gloves provided by the Service Department only irritated her hands more. (Id. at 25.) Zeigler said that Darling then told her that she could purchase gloves if that was what she needed. (Id.) Zeigler testified that if Weigand and Botham "wanted gloves, they would just go and get a pair and mark it down on . . . a chart." (Id.) Zeigler also testified that Darling frequently chastised her in front of customers and that she felt that he was making a *Page 5 
"fool" out of her. (Id. at 26.) Never did she see Darling confront Weigand, Stevenson, or Botham in front of customers. (Id. at 27-28.)
Zeigler described Darling's treatment of her as emotionally draining and said, after work, she would be a "mess the rest of the day." (Id. at 28.) When her grandson would visit, she would be unable to enjoy him. (Id.)
On August 6, 2003, Zeigler approached Gregory to tell him that she did not like the way she was being treated. (Id. at 35.) She testified, that she told him that she wanted "to be treated like the guys with respect." (Id.) Gregory said that he would look into it. (Id.) Prior to August 6, 2003, Zeigler did not approach Gregory or Brogan because it was her understanding, from talking with other employees, that the company policy was to talk to one's immediate supervisor if there was a problem. (Id. at 36-37.)
On August 7, 2003, Zeigler visited her physician, Dr. Carolyn Troise, who told Zeigler to take thirty days out of work, gave her medication, and advised her to see a therapist. (Id. at 34.)[1] Zeigler presented a doctor's note, signed by Dr. Troise, to Gregory, as well as Darling and Brogan, recommending that Zeigler stay out of work from August 7, 2003 to September 7, 2003. (Id. at 39; Complainant's Ex. 1.) Zeigler did not work at J.J. Gregory, therefore, after August 6, 2003. (Tr. at 30, May 30, 2006.) Zeigler testified that, after she left work, she began seeing psychological counselor Pat *Page 6 
Morena. (Id. at 42.) She visited Morena for two or three months, beginning in September 2003. (Id. at 43.)
J.J. Gregory sent Zeigler a termination letter dated August 28, 2003 that was signed by Brogan. (Id. at 46; Complainant's Ex. 2.) The letter provides, in part, "As a result of diminished demand, and certain economic conditions in the Parts Department, it became necessary to implement a complete restructuring and reorganization of the Department. Hence, staffing needs had to be downsized. Therefore, at this time your employment is hereby terminated effective this date." (Complainant's Ex. 2.) Further, it provides, "Thank you for your valued service." (Id.) On August 10, 2003, three days after Dr. Troise told Zeigler to take thirty days off and weeks before the company terminated Zeigler, her husband came across an advertisement placed by J.J. Gregory inThe Providence Journal seeking to hire a parts clerk. (Tr. at 48, May 30, 2006; Complainant's Ex. 3.)
During her employment with J.J. Gregory, Zeigler had never received any reprimands. (Tr. at 33, May 30, 2006.) Darling had never told her that she was doing her job improperly. (Id.) No customers had filed any complaints about her. (Id. at 33-34.) From all appearances, Zeigler had been a valuable employee.
 B Kenneth Zeigler's Testimony
Brenda Zeigler's husband, Kenneth Zeigler, testified that he had been married to her for six years. (Id. at 82.) He stated that his wife constantly came home from work upset. He said, "One time she was so upset at home, she was sitting in her car crying." (Id. at 84). Kenneth Zeigler testified that she was very distressed, and she could not *Page 7 
believe that Darling was treating her so poorly. (Id. at 85.) "She would just come home crying, very upset. Some days, she'd come home and she didn't even want to cook dinner. She just wanted to go to bed because she was depressed, and she would say things that Mark would single her out." (Id. at 86.) She would sit in a chair at night and cry. (Id. at 87.) According to her husband, Zeigler's emotional condition improved over time after she left J.J. Gregory. (Id. at 87-88.)
 C Frederick Weigand's Testimony
Weigand testified that he was a parts clerk for a little over thirty-six years. (Id. at 91.) At the time Zeigler left J.J. Gregory in August of 2003, there were three parts clerks: Weigand, Botham, and Zeigler. (Id. at 93.) When Zeigler left, the department functioned with two parts clerks for a couple of months before the company hired another parts clerk. (Id. at 94.) Before Weigand retired on December 31, 2003, he was unaware of any downsizing in the department. (Id. at 95.)
Weigand believed that the relationship between Darling and Zeigler deteriorated over time. (Id. at 96.) He testified, "If she would bring up a subject like this department is planning to do this or that, he would just tell her to mind her own business and be quiet. And that is not the way his relationship with her started out." (Id.) Weigand could not understand why Darling would raise his voice with Zeigler. (Id. at 97.) Darling maintained good relationships with the other parts clerks. (Id.) After J.J. Gregory terminated Zeigler, Darling told Weigand that he would never hire another woman. (Id. at 98.) *Page 8 
 D John J. Gregory III's Testimony
Gregory testified that he is the operating partner and a shareholder of J.J. Gregory. (Id. at 101.) He also testified that he is Vice President of J.J. Gregory. (Tr. at 5, July 17, 2006.) He stated that as a company policy, if an employee had any complaints, he or she should notify his or her immediate supervisor and then, if necessary, go up the chain of command to the general manager. (Tr. at 101, May 30, 2006.) If a manager was having a problem with an employee, the manager could file a complaint against the employee that would be placed in the employee's file. (Id. at 102.) Complaints typically would document problems with customers or fellow employees. (Id.)
From his personal observations, Gregory testified that Zeigler did her job. (Id. at 103.) He was not aware of any documentation in her personnel file indicating poor job performance. (Id. at 103-04.) He could not remember any complaints made to him about her job performance. (Id. at 104.) When asked if Zeigler was a valued employee, Gregory responded, "I had no issues with Brenda's job performance." (Id. at 110.)
J.J. Gregory filed a response to Zeigler's claim of discrimination with the Commission that asserted that "[Zeigler] was terminated because the Parts Department was downsized from three to two persons and complainant had the poorest work performance." (Complainant's Ex. 4.) It further provided that "[a]ny criticism leveled at [Zeigler] was justified, based upon her poor work record." (Id.)
Of his August 6, 2003 meeting with Zeigler, Gregory testified that Zeigler was very dissatisfied with Darling. (Tr. at 105, May 30, 2006; Tr. at 8, July 17, 2006.) He could not remember the specifics of their conversation. (Tr. at 105, May 30, 2006.) It *Page 9 
was the only complaint that Zeigler made to him about her working conditions during her employment there. (Tr. at 7, July 17, 2006.) The next day, Gregory told Darling about Zeigler's complaint, and Darling said that he "was not overly satisfied with her and that he had some issues with her." (Tr. at 107, May 30, 2006.) He also could not recall the specifics of that conversation. (Id.) He testified, "[I]t was nothing of note. If it had been, I would have written it up and made a formal record of it for myself and for my memory, but no, other than there was some dissatisfaction as well with Brenda [Ziegler]." (Tr. at 8-9, July 17, 2006). Darling did not make any formal complaints about Zeigler to Gregory. (Id. at 7.)
Gregory testified that the advertisement for a parts clerk appearing in the August 10, 2003 edition of The ProvidenceJournal was probably for Weigand's position. (Tr. at 111, May 30, 2006.) He stated, "[I]t's not always easy to find help. You don't know if you're gonna [sic] get an immediate response or if it will take some time and you also have to train some people." (Id. at 112.) According to Gregory, he terminated Zeigler because he wanted to downsize the business in the parts department. (Tr. at 9, July 17, 2006.) She was chosen because she had not been getting along with Darling. (Id.) As of January 1, 2004, the parts department had two counter people. (Id. at 10.)
 E Doris Sears's Testimony
Sears testified that she was working as a part-time clerk from 2002 to August of 2004. (Tr. at 9, June 16, 2006.) As a clerk, Sears would create the purchase orders for parts. (Id. at 10.) She stated that Zeigler was excellent with customers. (Id. at 12.) Specifically, Sears "found her very pleasant. Good sense of humor. She was in demand *Page 10 
by our customers. Many of the calls were directed just for her." (Id.) Sears also testified that Zeigler got along very well with her fellow employees, except for Darling. (Id. at 13.) Sears said that Darling was very prejudiced against Zeigler, and she often found Zeigler in tears after dealing with him. (Id. at 14.) Sears believed that Darling was threatened by Zeigler and disliked her because she was very knowledgeable as a parts department employee. (Id.) Sears described it as a personality conflict between Darling and Zeigler. (Id. at 27.)
After J.J. Gregory terminated Zeigler, the company hired Andy Sunderland to replace her. (Id. at 21.) One time, Darling made a comment to Sears to make sure that he did not hire any more women. (Id.)
 F Kaylee Amaral's Testimony
Amaral testified that she began working in the parts department on July 12, 2004. (Id. at 31.) Darling interviewed her and hired her. (Id.) He did not do so until several months after Zeigler filed her charge of discrimination with the Commission. (Id.; Resp. Ex. A.) Amaral said of Darling, "He knew how he wanted to run the department, and he knew how he wanted everyone to work side by side and to maker sure everything went properly." (Tr. at 32, June 16, 2006).
 G Richard Brogan's Testimony
Brogan testified that he is the corporate secretary and general manager of J.J. Gregory (Id. at 33.) He was Darling's direct supervisor in the parts department. (Id.) *Page 11 
Brogan never received any written or verbal complaints from Zeigler about Darling. (Id. at 34.)
Regarding the advertisement in The Providence Journal, Brogan explained:
 There were a number of issues that developed that week. Brenda gave her medical leave notice on Thursday. Rob Barthom [sic] came in — he was another member of the parts department. He came in and announced that he was giving his two-week notice. Mark was going on vacation for a week, and Fred Weygand [sic] had already months before announced that as [of] December 31st he was retiring. So in a meeting with Jay [Gregory] after — mostly after Rob's announcement that he was leaving we were saying we're very — you know, we're short-handed. We need to get somebody to fill that department. Fred can't handle it himself for the next five months. So we put the ad in the paper that weekend.
(Id. at 36-37.) Further, he testified that J.J. Gregory did not place the advertisement to fill Zeigler's position, but rather to fill Weigand's position earlier than it originally anticipated. (Id. at 37.) After speaking with Darling, Brogan decided to terminate Zeigler. (Id. at 38.) As of January 1, 2004, following Weigand's retirement, the parts department operated with two parts clerks rather than three due to economic conditions and the business climate. (Id.) Specifically, Brogan explained, "When we decided to downsize, we didn't quite know which direction we were going to go. But we said if we were going to put two people on the counter, Mark [Darling] indicated that he wasn't happy with Brenda's job performance." (Id. at 39.) "The decision was between Jay [Gregory] and Mark [Darling] and myself, and we had decided on the downsizing. (Id. at 46.) Darling left J.J. Gregory in November of 2004, less than a year after Zeigler filed her charge of discrimination against the company based largely on his actions. (Id. at 40; Resp. Ex. A.) *Page 12 
Brogan explained that if an employee committed an egregious offense, "[i]t would be written up by the manager, signed by both parties and filed in their personnel records." (Tr. at 42, June 16, 2006.) There were no written reprimands in Zeigler's personnel file to suggest that her job performance was subpar. (Id.) When asked why the August 28, 2003 termination letter thanks Zeigler for her valued service, Brogan responded, "That was written as a professional courtesy, just a business courtesy. . . ." (Id. at 44.)
 H Mark Darling's Testimony
Darling testified that he worked at J.J. Gregory for seventeen years until November of 2004. (Tr. at 4, Aug. 17, 2006.) For the final three years of his employment he served as parts manager. (Id.) He explained his role in the hiring of Zeigler: "I'm the one that made the call to her previous employer to see if she'd be willing to come to J.J. Gregory for employment and then I consequently hired her." (Id. at 5.) He did not recall criticizing her any more than the other employees and denied criticizing her in front of customers. (Id. at 6.) Darling testified that he would not have criticized Zeigler for going to lunch late because she was assisting a customer because "the customer comes first." (Id. at 7.)
When asked if he would question Zeigler first when a mistake occurred, Darling responded:
 [W]hen we hired her she was going to be the assistant manager out there and kind of run that area of the department while I was in doing my business. So naturally, I would go to her first and then go to the other two if she couldn't resolve the problem. *Page 13 
(Id.) Regarding the time he commented on Zeigler's sneakers, Darling acknowledged that the two other parts clerks were not wearing steel-toed shoes. (Id. at 9.) He told them that they also would have to wear steel-toed shoes the next day at work. (Id.) When questioned about Zeigler's complaints about gloves, Darling testified:
 If I remember correctly, it was about a week before the sneaker incident that she started wanting to wear gloves to do hydraulic hoses. Now, we had always supplied a pair of brown cotton gloves to do hydraulic hoses, that's what I always used, and granted, the oil would get through those, but in the back there also we had rubber gloves with a felt lining that were also available for use and we also had rubber gloves like doctors wear with both powder and non-powder that the mechanics used in the shops to keep oil off of their hands and she said she couldn't wear any of those because of various reasons.
 . . .
 She had requested some special pair of gloves that she says the other guys got, and the only other pair of gloves that those guys ever got was a pair of yellow gloves that was supplied by our other store and any time those are supplied to mechanics or whoever wanted those physically paid for those.
(Id. at 10-11.) Darling admitted that there were some things about Zeigler that bothered him. He testified, "She was vulgar around — not around customers so it wasn't something that would affect the company that way as far as the customer relations, but she was vulgar around the mechanics and the other parts personnel." (Id. at 14.) Her vulgarity was not consistent with the behavior of the other parts department employees. (Id. at 35.) Darling said that he never complained to anyone at the Appellant about Zeigler's vulgarity. (Id. at 37.) Regarding Weigand's testimony that Darling said he would never hire another woman, Darling stated: *Page 14 
 I may have said that in the heat of the moment, yes, to Fred Weigand, but I have no problem with women at all. You know, and it would have been in the heat of the moment. I've worked with many women; I've never had trouble working with women.
(Id. at 18.) Darling mentioned that he "hired Doris [Sears] previous to that and [he] hired Kaylee [Amaral] to do basically what Doris was doing after that." (Id. at 19.) The parts department operated with two counter people after Weigand left in December of 2003. (Id. at 22.) He explained, "I think late summer we did bring one of the employees that was already employed there to help out in the parts department. . . ." (Id.) Darling testified, however, that when Zeigler left the parts department, no plans existed to downsize the department. (Id. at 23, 31.) He claimed that the company advertised inThe Providence Journal to try to fill the position left vacant when Weigand left. (Id. at 23.)
Regarding J.J. Gregory's complaint policy, Darling said that if he had a problem with an employee, he would speak to that employee first, and if the problem was egregious enough, he would place a written complaint in the employee's file. (Id. at 25.) He testified that Zeigler's performance as a parts person was fine. (Id. at 25-26.) She was good with customers, and she was not a problem with the other employees. (Id. at 29.) Darling did not believe that her job performance warranted termination. (Id. at 31, 34.) Darling hired Zeigler, but he had nothing to do with her termination. (Id. at 35.)
 II Administrative Decision and Appeal
On September 28, 2007, after multiple hearings and a review of the testimony of all of these witnesses, the Commission found that J.J. Gregory had "discriminated against [Zeigler] because of her sex with respect to terms and conditions of employment and *Page 15 
termination" ("Decision I").[2] Specifically, the Commission determined that "[t]he complainant was treated more harshly than her male co-workers." (Decision I at 7.) As evidence of this disparate treatment, the Commission cited Darling's harsh criticism and confrontations, including criticism for delaying her lunch and for wearing sneakers, and delay in dispensing her bonus check. (Id. at 6.) Regarding her termination, the Commission found that Darling's "prejudice against [Zeigler], which was based on her sex, led him to provide false information to [Gregory] which led to her termination." (Id. at 11.) The Commission ordered,inter alia, that J.J. Gregory cease and desist from all unlawful employment practices, offer Zeigler the next available position of parts clerk, pay Zeigler $588.25 per week minus unemployment benefits and interim earnings for the period from September 7, 2003 until she received a parts clerk position or refused an offer of such a position, pay Zeigler $6,000 as compensatory damages for pain and suffering within forty-five days of the order, and pay her interest on those amounts. (Id. at 17.) It also addressed the procedure to determine any offset for unemployment benefits, interim earnings and interim employment benefits received by Zeigler between September 7, 2003 and the date of the Commission's order. (Id. at 17-18.)
On October 16, 2007, J.J. Gregory filed a complaint in the Rhode Island Superior Court, pursuant to R.I. Gen. Laws §§ 42-35-1 et seq., asserting that it was aggrieved by the Commission's decision (Decision I). Specifically, it challenges that decision as clearly erroneous, arbitrary and capricious, and characterized by abuse of discretion or clearly unwarranted exercise of discretion. The company also avers that the decision was *Page 16 
in excess of the statutory authority of the agency and against legal precedent. Accordingly, it claims that its substantial rights have been prejudiced.
On December 31, 2007, the Commission ordered that J.J. Gregory pay Ziegler $39,877.59 in back pay and interest, $8,186.32 in attorney's fees, and $442.21 in costs. ("Decision II"). J.J. Gregory filed an amended complaint in the Rhode Island Superior Court on January 30, 2008 asserting that it was further aggrieved by this decision.
 III Standard of Review
This Court sits as an appellate court with a limited scope of review when reviewing the decisions of the Commission. SeeMine Safety Appliances Co. v. Berry,620 A.2d 1255, 1259 (R.I. 1993). This Court's standard of review for a decision of the Commission is set forth by statute, as follows:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or [sic] law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion
R.I. Gen. Laws § 42-35-15(g).
This Court's review authority granted by § 42-35-15 is "circumscribed and limited to `an examination of the certified record to determine if there is any legally *Page 17 
competent evidence therein to support the agency's decision.'"Nickerson v. Reitsma, 853 A.2d 1202, 1205 (R.I. 2004) (quotingBarrington Sch. Comm. v. R.I. State Labor Relations Bd.,608 A.2d 1126, 1138 (R.I. 1992)). This Court must affirm the agency's decision if any legally competent evidence to support it exists in the record. R.I. Pub. Telecomm. Auth. v. R.I. StateLabor Relations Bd., 650 A.2d 479, 485 (R.I. 1994). "Legally competent evidence is indicated by the presence of `some' or `any' evidence supporting the agency's findings." Envir'l ScientificCorp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993) (citingSartor v. C.R.M.C., 542 A.2d 1077, 1082-83 (R.I. 1988));see also Arnold v. R.I. Dept. of Labor and TrainingBd. of Rev., 822 A.2d 164, 167 (R.I. 2003) (defining legally competent evidence as "relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance[]") (quoting R.I. Temps, Inc. v. Dep't of Labor and Training, Bd. ofRev., 749 A.2d 1121, 1125 (R.I. 2000)).[3]
This Court may not substitute its judgment for the decision of the agency with respect to "credibility of the witnesses or the weight of the evidence concerning questions of fact." Costa v. Registrarof Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988) (citingNewport Shipyard, Inc. v. R.I. Comm'n for Human Rights,484 A.2d 893 (R.I. 1984)); see also Lee v. R.I.Council 94, 796 A.2d 1080, 1083 n. 1 (R.I. 2002) (stating that "it is well settled that judicial review of agency decisions is limited to questions of law and the reviewing court may not make factual findings") (citation omitted). However, "`[q]uestions of law determined by the administrative agency are not binding upon [this *Page 18 
Court] and may be freely reviewed to determine the relevant law and its applicability to the facts presented in the record.'"Iselin v. Retirement Bd. of Employees' Retirement Syst.of R.I., 943 A.2d 1045, 1048-49 (R.I. 2008) (quoting StateDep't of Envir'l. Mgmt. v. State Labor Relations Bd.,799 A.2d 274, 277 (R.I. 2002)) (further citation omitted).
"[A]n administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." Costa v. Registrar ofMotor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988) (citingNewport Shipyard, 484 A.2d 893.) In addition, the arbitrary and capricious standard of review "means that reviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence." Goncalves v. NMU PensionTrust, 818 A.2d 678, 682-83 (R.I. 2003) (citing Doyle v. PaulRevere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)). Furthermore, this Court "may reverse, modify, or remand the agency's decision if the decision is violative of constitutional or statutory provisions." Nickerson, 853 A.2d at 1205 (quotingBarrington Sch. Comm., 608 A.2d at 1138). Our Supreme Court has explained that the "statutory reference to errors of law or violation of constitutional provisions [extends] only [to] determinations by the agency that might in themselves violate statutory or constitutional principles." Easton's Point Ass'n v.C.R.M.C., 522 A.2d 199, 202 (R.I. 1987).
 IV Law and Analysis
In enacting the State Fair Employment Practices Act, R.I. Gen. Laws §§ 28-5-1 et seq., our General Assembly stated that it is "the public policy of this state to foster the *Page 19 
employment of all individuals in this state in accordance with their fullest capacities, regardless of their . . . sex . . . and to safeguard their right to obtain and hold employment without such discrimination." § 28-5-3. Our Supreme Court has explained, "The State Fair Employment Practices Act . . . prohibits an employer from either discharging an employee or discriminating against an employee with respect to `terms, conditions or privileges of employment' based on that employee's sex. . . ." DeCamp v. Dollar TreeStores, Inc., 875 A.2d 13, 20 (R.I. 2005) (citing § 28-5-7(1)(i)-(ii)).[4] In interpreting the State Fair Employment Practices Act, Rhode Island courts "remain faithful to federal precedents interpreting federal antidiscrimination statutes, such as Title VII." Id. (citation omitted).
Our Supreme Court has distinguished the gender-based disparate treatment theory of employment discrimination from the hostile work environment theory. "A gender-based disparate treatment claim follows the three-step burden-shifting legal framework first announced in [McDonnell Douglas Corp. v. Green411 U.S. 792 (1973)]." Id. at 21. (citations omitted). Federal courts developed this burden-shifting framework to *Page 20 
"`progressively . . . sharpen the inquiry into the elusive factual question of intentional discrimination.'" Neri v. Ross Simons,Inc., 897 A.2d 42, 48 (R.I. 2006) (quoting Center forBehavioral Health, R.I., Inc. v. Barros,710 A.2d 680, 685 (R.I. 1998)) (further citation omitted);see also Newport Shipyard,484 A.2d at 897-98 (stating that "in considering claims brought pursuant to our chapter 5 of title 28, [courts] should [look] for guidance in this sensitive area to decisions of the federal courts in construing Title VII of the Civil Rights Act of 1964[]"). Our Supreme Court has noted, however, that "[d]espite this burden shifting, the employee has the ultimate burden of persuasion in these matters." Barros, 710 A.2d at 685 (citation omitted).
To establish a prima facie case of gender-based disparate treatment — which is the first step in the burden-shifting framework — a plaintiff must show that:
 "(1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications."
DeCamp, 875 A.2d at 21 (quoting Smith v. Stratus Computer,Inc., 40 F.3d 11, 15 (1st Cir. 1994)); see alsoResare v. Raytheon Co., 981 F.2d 32, 42 (1st Cir. 1992) (providing that the fourth element of the prima facie
case requires that "the employer did not treat sex neutrally or that opposite sex employees doing the same or similar work were retained[])" (citation omitted). Establishing a prima facie
case is not onerous. DeCamp, 875 A.2d at 21. In fact, with respect to the first element, "`every person is in a class protected against gender discrimination.'" Neri,897 A.2d at 49 (citation omitted). At the first step, "a court should keep its analytical eye focused on the central inquiry in a disparate treatment sex discrimination case[,]" namely whether an employee was treated *Page 21 
less favorably because of his or her gender. Resare,981 F.2d at 42 n. 21 (citation omitted). When a plaintiff establishes a prima facie case, a rebuttable presumption arises that the defendant unlawfully discriminated against the plaintiff.Neri, 897 A.2d at 49 (citation omitted).
"The second step requires the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action."DeCamp, 875 A.2d at 21-22 (citation omitted). The employer's offer of a legitimate, nondiscriminatory reason is simply a burden of production rather than a burden of persuasion. Neri,897 A.2d at 49 (citation omitted). When a legitimate, nondiscriminatory reason is produced, the rebuttable presumption created by the prima facie case is eliminated.Id. at 49-50 (citation omitted).
"[T]he third step requires the employee to convince the fact-finder that the legitimate, nondiscriminatory reason was [a] pretext for unlawful discriminatory animus." DeCamp,875 A.2d at 21-22 (citation omitted). The burden of proof for this third step rests with the employee. Neri,897 A.2d at 50 (citation omitted). An employee does not have to offer "smoking gun" evidence of discrimination but must prove that the employer's proffered reason for termination taking the adverse employment action was a pretext for discriminatory animus.Neri, 897 A.2d at 50 (citation omitted); seeBarros, 710 A.2d at 685 (establishing that an employee must do more than simply cast doubt on the employer's explanation) (citation omitted); Resare,981 F.2d at 42 (stating that circumstantial evidence can be used to prove a discriminatory animus, "including comments by decision-makers which denigrate women[]" (citation omitted)). Specifically, "[a]n employee can establish pretext `either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing *Page 22 
that the employer's proffered explanation is unworthy of credence.'"Barros, 710 A.2d at 685 (quoting Texas Dept. of CommunityAffairs v. Burdine, 450 U.S. 248, 256 (1981)).
Our Supreme Court has explained that "`a plaintiff's primafacie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'"Neri, 897 A.2d at 50 (quoting Casey v. Town ofPortsmouth, 861 A.2d 1032, 1038 (R.I. 2004)) (further citation omitted). Additionally, the inference of discrimination is stronger when the employer's proffered reason for termination is "`accompanied by a suspicion of mendacity.'"Id. (citation omitted); see Barros,710 A.2d at 685 (stating that "in situations in which the elements of a sufficient prima facie case combine with the factfinder's belief that the basis for dismissing the employee was pretextual, particularly if `accompanied by a suspicion of mendacity,' the factfinder is permitted to `infer the ultimate fact of intentional discrimination[]'") (citation omitted).
"A gender-based hostile work environment claim, in contrast, allows an employee to recover against his or her employer `[w]hen the workplace is permeated with "discriminatory intimidation, ridicule, and insult,"' that is `"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."' DeCamp, 875 A.2d at 21 (quotingHarris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)) (further citation omitted). The hostile work environment theory is frequently the basis for sexual harassment claims regarding the terms and conditions of employment. Id. at 22 n. 8. In determining whether a gender-based hostile work environment exists, consideration must be given to the record as a whole in light of the totality of the circumstances.Id. at 22 (citation omitted). *Page 23 
Our Supreme Court has established the following test for determining whether a gender-based hostile work environment exists, requiring a plaintiff to prove:
 (1) the employee is a member of a protected class; (2) the employee was subjected to unwanted harassment; (3) that harassment was based upon his or her sex; (4) "that the harassment was sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment;" (5) that harassment "was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so;" and (6) "that some basis for employer liability has been established."
Id. at 22-23 (quoting O'Rourke v. City of Providence,235 F.3d 713, 728 (1st Cir. 2001)). To determine whether the harassment was objectively and subjectively offensive, courts must look at all of the circumstances, "including the `frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. at 24 (quotingFaragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)) (further citation omitted); see also Mann v.Lima, 290 F. Supp. 2d 190, 195 (D.R.I. 2003) (including "the effect of the conduct on the employee's psychological well-being" among the factors that deserve consideration in assessing the severity or pervasiveness of allegedly harassing conduct) (citation omitted).
 A Terms and Conditions of Employment
On appeal, J.J. Gregory has accused the Commission of improperly blending the disparate treatment and hostile work environment theories of discrimination, thereby producing an irretrievably flawed decision. It bases its argument on footnote six inDeCamp, in which our Supreme Court characterized blending these theories as clear *Page 24 
error. DeCamp, 875 A.2d 13, 21 n. 6. Our Supreme Court stated, that "a gender-based disparate treatment claim does not depend upon a prima facie showing of a hostile work environment and a hostile work environment claim does not utilize the burden-shifting framework." Id. (citation omitted). J.J. Gregory also argues that even if the facts of the company's treatment of Zeigler are viewed in a light most favorable to her, those facts are insufficient as a matter of law to establish that she was subject to a hostile work environment.
The Commission argues that it did not blend the disparate treatment and hostile work environment standards. It contends that it analyzed the terms and conditions of Zeigler's employment under the hostile work environment theory and Zeigler's termination under the disparate treatment framework. Additionally, the Commission asserts that the evidence of Darling treating Zeigler differently than her male co-workers through continuous verbal abuse and criticism was sufficient to support a finding of a hostile work environment.
Although the Commission did not explicitly address the elements of a gender-based hostile work environment established by our Supreme Court in DeCamp, its recitation of case law reflects that it based its finding of discrimination with respect to the terms and conditions of Zeigler's employment on the hostile work environment theory. (Decision I at 7 (citing Gorski v. N.H. Dept. ofCorrections, 290 F.3d 466, 471 (1st Cir. 2002)); O'Rourke v.City of Providence, 235 F.3d 713 (1st Cir. 2001). The Commission's lack of clarity in its decision does not constitute legal error. Regardless, "`[q]uestions of law determined by the administrative agency are not binding upon [this Court] and may be freely reviewed to determine the relevant law and its applicability to *Page 25 
the facts presented in the record.'" Iselin,943 A.2d 1045, 1048-1049. Considering that the hostile work environment theory is frequently the basis for sexual harassment claims regarding the terms and conditions of employment, and noting the Commission's decision to apply this line of case law, this Court also will examine the terms and conditions of Zeigler's employment in light of the law applicable to a hostile work environment claim.
As a female, and thereby a member of a protected class, Zeigler satisfies the first element of a hostile work environment claim.See DeCamp, 875 A.2d at 22; Neri,897 A.2d at 49 (establishing that "`every person is in a class protected against gender discrimination'" (citation omitted)). Regarding the second element, "[a]s is often the case, there is little doubt that [Zeigler] `. . . considered [J.J. Gregory's] conduct unwelcome.'" See DeCamp, 875 A.2d at 23 (quotingO'Rourke, 235 F.3d at 728). Zeigler confronted both Darling and Gregory about the treatment she received. (Tr. at 18, 35, May 30, 2006.) The treatment induced her to seek medical and psychological assistance, (id. at 34, 42), and frequently drove her to tears. (Id. at 84-87.)
The next element for consideration is whether the harassment was based upon her gender. To satisfy this element, however, our Supreme Court has noted that the "harassing conduct . . . need not be sexual in nature." DeCamp, 875 A.2d at 22 n. 8. The Commission found, and substantial evidence in the record supports, that Zeigler was treated differently than her male colleagues because of her gender. That different treatment included Darling speaking to Zeigler harshly in front of customers, criticizing her delay in taking her lunch and wearing sneakers, refusing to provide her better gloves, and delaying a bonus payment. (Decision I at 2-3, 6.) The Commission also found *Page 26 
credible Weigand's testimony that despite Darling's good relationship with the male parts clerks, Darling was harsh to Zeigler and that Darling said he would never hire another woman. (Decision I at 7, 10; Tr. at 96-98, May 30, 2006.) The Commission similarly found Sears's testimony credible that Darling was prejudiced against and verbally abusive to Zeigler and that Darling told Sears to make sure that he did not hire any more women. (Decision I at 7, 10; Tr. at 14, 21, 29, June 16, 2006.) This different treatment and overt expressions of discrimination constitute substantial evidence that Darling harassed Zeigler based upon her sex. See Newport Shipyard, Inc.,484 A.2d at 897.
This Court next must consider, relative to Zeigler's hostile work environment claim, whether the harassment of her was sufficiently severe and pervasive so as to alter the conditions of her employment and create an abusive work environment. As noted above, the Commission found credible the testimony of Zeigler, Weigand, and Sears, all of whom described, in addition to specific incidents, a work place permeated by Darling's ongoing abusive and humiliating treatment of Zeigler. (Tr. at 16-18, 96-98, May 30, 2006; Tr. at 14, 29, June 16, 2006);see Carrero v. N.Y. City Housing Auth.,890 F.2d 569, 577 (2d Cir. 1989) (stating that the "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive[]" (citation omitted)). Such treatment damaged Zeigler's psychological well-being, prompting her to require mental health assistance. See Mann v.Lima, 290 F. Supp. 2d 190, 195 (D.R.I. 2003) (including "the effect of the conduct on the employee's psychological well-being" among the factors that deserve consideration in assessing the severity or pervasiveness of allegedly harassing conduct) (citation omitted). A review of the totality of the circumstances reveals that substantial evidence exists to support the *Page 27 
conclusion that severe and pervasive harassment of Zeigler altered her conditions of employment and created an abusive work environment. See Newport Shipyard, Inc.,484 A.2d at 897.
In considering whether the harassment was objectively and subjectively offensive, courts must evaluate the `frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance.'" DeCamp, 875 A.2d at 24 (quotingFaragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)) (further citation omitted). As mentioned above, substantial evidence exists in the record to show that Darling subjected Zeigler to continuing, abusive treatment in the presence of her co-workers and customers. A reasonable person would consider such sustained, abusive treatment, from which one's colleagues were shielded because of their sex, offensive and humiliating. Though the record is devoid of evidence that Darling physically threatened Zeigler, Darling unreasonably interfered with her job performance as evidenced by Zeigler's total disablement "from her normal and customary employment from August, 2003 at least through March 15, 2004 as the proximate result of job induced stress." (Complainant's Ex. 5.) Further, Zeigler, as evidenced by her tears and need for medical and psychological assistance, found the conduct hostile and offensive.See DeCamp, 875 A.2d at 24. Thus, substantial evidence exists in the record to support the finding that Darling's harassment of Zeigler was objectively and subjectively offensive.See Newport Shipyard, Inc., 484 A.2d at 897.
Lastly, this Court must consider whether some basis for employer liability has been established. In addressing this factor, our Supreme Court has adopted the holding *Page 28 
of the United States Supreme Court in Suders that "`an employer is strictly liable for supervisor harassment that culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."' DeCamp,875 A.2d at 24 n. 11 (quoting Pennsylvania State Police v.Suders, 542 U.S. 129 (2004)). Because Darling's harassment of Zeigler culminated in her termination, J.J. Gregory is strictly liable for Darling's harassment. As such, a basis for the employer's liability has been established.
Accordingly, this Court finds that substantial evidence exists in the record to support each of the requisite elements of a gender-based hostile work environment claim with respect to the terms and conditions of Zeigler's employment with J.J. Gregory. Thus, the Commission's conclusion that the company discriminated against Zeigler with respect to the terms of conditions of her employment is not clearly erroneous, arbitrary and capricious, characterized by abuse of discretion, in excess of statutory authority, or against legal precedent. Because the substantial rights of J.J. Gregory have not been prejudiced by the decision of the Agency, this Court affirms the Commission's conclusion that the company discriminated against Zeigler with respect to the terms and conditions of her employment in violation of R.I. Gen. Laws § 28-5-7.
 B Termination
In addition to finding that J.J. Gregory discriminated against Zeigler with respect to the terms and conditions of her employment, the Commission concluded that the company terminated her because of her gender. The Commission used the burden shifting, disparate treatment analysis, previously described by this Court, to reach that determination. (Decision I at 7-11); see, e.g.,DeCamp, 875 A.2d at 21-22. J.J. Gregory *Page 29 
asserts that the Commission ignored the same actor inference, which provides that when the same group of individuals that hires a person terminates that person, an inference that discrimination did not motivate that termination arises. It also contends that the Commission had no legal basis to conclude that the proffered downsizing was a pretext. Further, the company claims that no evidence exists that Zeigler's termination was due to her gender.
Zeigler counters that clear and convincing evidence established aprima facie case of the company's repeated violations of § 28-5-7. The Commission separately claims that it considered the same actor inference but found it unpersuasive in the face of evidence of discrimination. The Commission also argues that the finding of a discriminatory termination was supported by sufficient evidence. Specifically, it states that the Commission based this finding on the credible testimony of Zeigler and her witnesses and the lack of credibility of J.J. Gregory's witnesses.
This Court initially must consider whether substantial evidence exists in the record for Zeigler to satisfy the elements of aprima facie case as part of the burden shifting framework. First, as a woman, Zeigler is a member of a protected class. See DeCamp, 875 A.2d at 22. Next, she was performing her job at a level that eliminates any possibility that she was terminated for inadequate performance. She had never received any reprimands from the company or complaints from customers. (Decision I at 4; Tr. at 33-34, May 30, 2006.) Darling testified that he had no problems with her job performance and that she performed as well as her co-workers. (Decision I at 4; Tr. at 25-26, 31, 34, Aug. 17, 2006.) Similarly, Gregory testified that he was not aware of any complaints in Zeigler's personnel file or made to him personally, and he had no issues *Page 30 
with her job performance. (Decision I at 5; Tr. at 103-104, 110, May 30, 2006.) Zeigler suffered an adverse job action when J.J. Gregory terminated her in August of 2003. (Decision I at 4; Complainant's Ex. 2.) Lastly, the company retained Zeigler's male co-workers, Weigand and Botham, who performed the same work. (Tr. at 93-93, May 30, 2006); seeResare, 981 F.2d at 42 (establishing that the fourth element of the prima facie case requires that opposite sex employees doing the same or similar work were retained). Additionally, J.J. Gregory sought to replace Zeigler with an employee of roughly equivalent qualifications. See DeCamp, 875 A.2d at 21. On August 10, 2003, three days after Dr. Troise told Zeigler to take thirty days off from work, the company ran an advertisement inThe Providence Journal for a new parts clerk. (Tr. at 48, May 30, 2006; Complainant's Ex. 3.) A couple of months after it terminated Zeigler, J.J. Gregory hired a male parts clerk. (Decision I at 6; Tr. at 94, May 30, 2006; Tr. at 21, June 16, 2006.) Thus, substantial evidence exists in the record to satisfy the first step of the disparate treatment burden shifting framework — namely, the prima facie case.See Newport Shipyard, Inc., 484 A.2d at 897.
The second step requires J.J. Gregory to produce a legitimate, nondiscriminatory reason for Zeigler's termination. Such a legitimate, nondiscriminatory reason rebuts the presumption created by the prima facie case that the company unlawfully discriminated against Zeigler. See Neri,897 A.2d at 49-50. The Commission found that the company satisfied this burden of production. (Decision I at 8.) Gregory testified that Zeigler was terminated because he wanted to downsize the parts department, and Zeigler and Darling did not like one another. (Tr. at 9, July 17, 2006.) J.J. Gregory also filed a response to Zeigler's claim of discrimination with the Commission that asserted that "[Zeigler] was *Page 31 
terminated because the Parts Department was downsized from three to two persons and complainant had the poorest work performance." (Complainant's Ex. 4.) This Court notes that "[e]xamples of employer justifications for discharge in sex discrimination cases include: . . . poor work performance or incompetence; poor attitude; troublemaking and disruption of morale; insubordination; conflicts with, abusive language directed at or assaulting one's supervisor. . . ." 1 Lex K. Larson, EmploymentDiscrimination § 12.09[3] at 82-83 (2d ed. 2009) (footnotes omitted). Additionally, our Supreme Court has determined that eliminating positions to cut payroll constitutes a legitimate, nondiscriminatory reason for terminating an employee. See Neri,897 A.2d at 50. Accordingly, this Court concludes that substantial evidence exists in the record to support the Commission's conclusion that J.J. Gregory produced a legitimate, nondiscriminatory reason for Zeigler's termination. See Newport Shipyard, Inc.,484 A.2d at 897.
Because J.J. Gregory satisfied its burden of production in the second step, the proof pendulum then swung back to Zeigler to "`come forward with enough evidence to expose [the company's] articulated justification as a pretext, or cover-up, for sex discrimination.'"See Barros,710 A.2d at 686 (quoting Resare, 981 F.2d at 43.) The Commission did not find credible the company's claim that Zeigler was terminated to downsize the parts department. (Decision I at 9.) It noted that an advertisement for a parts clerk position ran inThe Providence Journal on August 10, 2003 and a new parts clerk was hired about two months after Zeigler's termination. (Id.) According to Gregory's own testimony, the parts department did not begin operating with two parts clerks for an extended period of time until Weigand's retirement on December 31, 2003. (Id. at 10.) Thus, J.J. Gregory would have been in the same position on January 1, 2004, *Page 32 
operating with two parts clerks, had it retained Zeigler and not hired Sunderland. The Commission also noted that Darling testified that the company had no plans to downsize when it terminated Zeigler. (Id. at 9; Tr. at 31, Aug. 17, 2006.) This Court thus finds that substantial evidence exists on the record to reject J.J. Gregory's downsizing explanation as a pretext. SeeNewport Shipyard, Inc., 484 A.2d at 897.
Similarly, the Commission found that J.J. Gregory's assertion that Zeigler had the poorest work performance was pretextual. (Decision I at 9.) Zeigler's termination letter, written by Brogan, thanked her for her "valued service." (Complainant's Ex. 2.) Gregory did not find any complaints in her personnel file and stated that "at the time when [Zeigler] was working for us, I thought she was a good employee." (Tr. at 112, May 30, 2006.) Darling also testified that Zeigler performed her job as well as the other parts department clerks. (Tr. at 34, Aug. 17, 2006.) Thus, the Commission noted that J.J. Gregory's own witnesses contradicted its assertion that Zeigler's poor job performance justified her termination. (Decision I at 9.) This Court finds that substantial evidence exists on the record to find that J.J. Gregory's claim that Zeigler performed her job poorly to be a pretext for unlawful gender discrimination. See Newport Shipyard, Inc.,484 A.2d at 897.
Lastly, the Commission found that Darling's dislike for Zeigler was animated by his unlawful, discriminatory animus. (Decision I at 9-10.) The Commission noted, as described previously by this Court, that Darling treated Zeigler differently than her male co-workers on a continuing basis. Darling also told Weigand that he would never hire another woman, and asked Sears to make sure that he did not hire any more women. (Tr. at 98, May 30, 2006; Tr. at 21, June 16, 2006.) Darling hired a woman parts clerk but *Page 33 
only after Zeigler filed her charge of sex discrimination against the company. (Tr. at 31, June 16, 2006; Resp. Ex. A.) This Court thus finds that substantial evidence exists on the record to find pretextual the company's claim that Zeigler was terminated because of Darling's mere dislike for Zeigler, apart from discriminatory animus. See Newport Shipyard, Inc., 484 A.2d at 897.
Thus, Zeigler convinced the Commission, through indirect evidence, that J.J. Gregory's proffered justifications were pretextual by demonstrating that they were unworthy of credence; she also convinced the Commission of pretext through the direct evidence of Darling's overt statements of gender-based discrimination.[5]See Barros, 710 A.2d at 685; Resare,981 F.2d at 42 (stating that circumstantial evidence can be used to prove a discriminatory animus, "including comments by decision-makers which denigrate women[]") (citation omitted). Further, the Commission ascribed Darling's discriminatory animus to the company. (Decision I at 11.) Gregory testified that Darling said he was unhappy with Zeigler's work performance after she complained to Gregory. (Tr. at 107, May 30, 2006; Tr. at 8-9, July 17, 2006.) Brogan also testified that Darling said he was dissatisfied with Zeigler's job performance and that Gregory, Brogan, and Darling collaborated on the decision to terminate Zeigler. (Tr. at 39, 46, June 16, 2006.) *Page 34 
In explaining the "rubber stamp" theory of employer liability, our Supreme Court has quoted Russell v. McKinney HospitalVenture, 235 F.3d 219, 226-27 (5th Cir. 2000): "`If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker, . . . it is proper to impute their discriminatory . . . attitudes to the formal decisionmaker.'"Shoucair v. Brown University, 917 A.2d 418, 430 (R.I. 2007);see also Cariglia v. Hertz Equipment RentalCorp., 363 F.3d 77, 87 (1st Cir. 2004) (stating that "`the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the [manager] . . . had influence or leverage over the decision making[]'") (quoting Laxton v. Gap Inc.,333 F.3d 572, 584 (5th Cir. 2003)). In light of Darling's influence over Gregory and Brogan, this Court finds that substantial evidence exists in the record to attribute Darling's discriminatory animus to J.J. Gregory. See Newport Shipyard, Inc.,484 A.2d at 897.
As substantial evidence exists in the record to support Zeigler'sprima facie case and to find J.J. Gregory's asserted justification false, the Commission was permitted to conclude that the company unlawfully terminated Zeigler. SeeNeri, 897 A.2d at 50. Further, the inference of discrimination is particularly strong because J.J. Gregory's proffered explanation that Zeigler performed poorly at work was negated by its own witnesses, triggering a suspicion of mendacity. Seeid. Accordingly, the Commission's conclusion that J.J. Gregory terminated Zeigler based upon her gender is not clearly erroneous, arbitrary or capricious, characterized by an abuse of discretion, in excess of statutory authority, or against legal precedent. Because the substantial rights of the company have not been prejudiced by that conclusion, this Court affirms the *Page 35 
Commission's decision that J.J. Gregory impermissibly terminated Zeigler based upon her gender in violation of R.I. Gen. Laws § 28-5-7.
 IV Conclusion
For the reasons set forth in this Decision, this Court affirms the decision of the Rhode Island Commission for Human Rights rendered on September 28, 2007 that found that J.J. Gregory Son Inc. had discriminated against Brenda A. Zeigler because of her gender with respect to the terms and conditions of her employment and her termination. As J.J. Gregory's challenge to the Commission's subsequent December 31, 2007 decision is premised on the same arguments that it advanced in support of its challenge to the Commission's September 28, 2007 decision, and this Court has rejected those arguments on appeal, this Court likewise affirms the December 31, 2007 decision of the Commission.
Counsel shall confer and submit to this Court forthwith for entry an agreed upon form of Order and Judgment that is consistent with this Decision.
[1] Dr. Troise's affidavit, submitted to the Commission by Zeigler, provides:
 That it is my opinion, to a reasonable degree of certainty in my profession as a duly licensed physician, that Brenda Ziegler [sic] was totally disabled from her normal and customary employment from August, 2003 at least through March 15, 2004 as the proximate result of job induced stress in the course of her employment with J.J. Gregory Sons which exacerbated her pain in her legs and feet resulting from diabetic neuropathy. . . .
(Complainant's Ex. 5.)
[2] The Commission also found that Zeigler "did not prove by a preponderance of the evidence that [J.J. Gregory] discriminated against her because she opposed unlawful employment practices, as alleged in the complaint." (Decision I at 6.) This conclusion is not at issue in the appeal before this Court.
[3] Substantial evidence has been defined synonymously with legally competent evidence as "`such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" Newport Shipyard, Inc. v. R.I. Comm'n for HumanRights, 484 A.2d 893, 897 (R.I. 1984) (quoting Caswell v.George Sherman Sand Gravel Co.,424 A.2d 646, 647 (R.I. 1981)).
[4] Section 28-5-7(1)(i)-(ii) provides:
 It shall be an unlawful employment practice:
 (1) For any employer:
 (i) To refuse to hire any applicant for employment because of his or her race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin;
 (ii) Because of those reasons, to discharge an employee or discriminate against him or her with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment. . . .
(Emphasis added.)
[5] J.J. Gregory contends that the Commission ignored the same actor inference. The same actor inference provides that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." Bradley v. Harcourt, Brace andCo., 104 F.3d 267, 270-271 (9th Cir. 1996). The same actor inference "can be overcome by evidence of discrimination." 1 Lex K. Larson, EmploymentDiscrimination § 8.03[8] at 61 (2d ed. 2009). The Commission properly considered the same actor inference but determined that it was overcome by evidence of discrimination:
 While it appears that Mr. Darling had a role in the complainant's hiring, and this is a factor to be considered in determining whether there is sex discrimination, Mr. Darling's disparate treatment of the complainant and overt statements of discrimination outweigh it in the assessment that he was motivated by sex discrimination.
(Decision I at 10.)
 *Page 1